**AVICOMM, INC., a Colorado Corporation, Plaintiff-Appellant,**

v.

**The COLORADO PUBLIC UTILITIES COMMISSION, Commissioner Christine E.M. Alvarez, Commissioner Vincent Majkowski, Commissioner Robert Hicks, and US West Communications, Inc., Defendants-Appellees.**

and

**Agate Mutual Telephone Company; Big Sandy Telecommunications, Inc.; Bijou Telephone Co-Op Association, Inc.; Columbine Telephone Company; Delta County Tele-Com, Inc.; Eastern Slope Rural Telephone Association, Inc.; Nucla-Naturita Telephone Company; Nunn Telephone Company; Phillips County Telephone Company; Plains Cooperative Telephone Association, Inc.; Strasburg Telephone Company; Sunflower Telephone Company, Inc.; Wiggins Telephone Association, ("Agate, et al."); Farmers Telephone Company; Haxtun Telephone Company; Peetz Cooperative**

Telephone Company; Pine Drive Telephone Company; Rico Telephone Company; Roggen Telephone Cooperative Association; Stoneham Cooperative Telephone Corporation; Universal Telephone Company of Colorado; Willard Telephone Company, ("Farmers et al."); and El Paso Telephone Company, Intervenors–Appellees.

MOUNTAIN SOLUTIONS LTD., INC., a Colorado corporation; and Denver Direct Dial, L.L.C., Plaintiffs–Appellants,

v.

The COLORADO PUBLIC UTILITIES COMMISSION, Commissioner Christine E.M. Alvarez, Commissioner Vincent Majkowski, Commissioner Robert Hicks, and US West Communications, Inc., Defendants–Appellees.

and

Agate Mutual Telephone Company; Big Sandy Telecommunications, Inc.; Bijou Telephone Co–Op Association, Inc.; Columbine Telephone Company; Delta County Tele–Com, Inc.; Eastern Slope Rural Telephone Association, Inc.; Nucla–Naturita Telephone Company; Nunn Telephone Company; Phillips County Telephone Company; Plains Cooperative Telephone Association, Inc.; Strasburg Telephone Company; Sunflower Telephone Company, Inc.; Wiggins Telephone Association, ("Agate, et al."); Farmers Telephone Company; Haxtun Telephone Company; Peetz Cooperative Telephone Company; Pine Drive Telephone Company; Rico Telephone Company; Roggen Telephone Cooperative Association; Stoneham Cooperative Telephone Corporation; Universal Telephone Company Of Colorado; Willard Telephone Company, ("Farmers et al."); and El Paso Telephone Company, Intervenors–Appellees.

Nos. 96SA417, 96SA418.

Supreme Court of Colorado,
En Banc.

April 13, 1998.

Ireland, Stapleton, Pryor & Pascoe, P.C., Tucker K. Trautman, Joseph G. Webb, Denver, for Plaintiff–Appellant AviComm, Inc.

Gorsuch Kirgis LLP, Dudley P. Spiller, Andrew D. Cohen, Denver, for Plaintiffs–Appellants Mountain Solutions Ltd., Inc.; and Denver Direct Dial, L.L.C.

Gale A. Norton, Attorney General, Richard A. Westfall, Solicitor General, Martha Phillips Allbright, Chief Deputy Attorney General, Linda L. Siderius, Deputy Attorney General, Richard Djokic, First Assistant Attorney General, Victoria R. Mandell, Assistant Attorney General, Mana L. Jennings Fader, Assistant Attorney General, Regulatory Law Section, Denver, for Defendants–Appellees The Colorado Public Utilities Commission, Commissioner Christine E.M. Alvarez, Commissioner Vincent Majkowski, Commissioner Robert Hicks, and US West Communications, Inc.

Antonio Bates Bernard, Professional Corporation, Roy A. Adkins, Denver, for Intervenor–Appellee El Paso County Telephone Company.

William P. Heaston, William M. Ojile, Jr., Karen Tatelman, Denver, for Defendants–Appellees US West Communications.

Denman & Corbetta, P.C., Steven H. Denman, Richard L. Corbetta, Melissa A. Dalla, Denver, for Agate Mutual Telephone Company; Big Sandy Telecommunications, Inc.; Bijou Telephone Co–Op Association, Inc.; Columbine Telephone Company; Delta County Tele–Com, Inc.; Eastern Slope Rural Telephone Association, Inc.; Nucla–Naturita Telephone Company; Nunn Telephone Company; Phillips County Telephone Company; Plains Cooperative Telephone Association, Inc.; Strasburg Telephone Company; Sunflower Telephone Company, Inc.; Wiggins Telephone Association.

LeBoeuf, Lamb, Greene & MacRae, L.L.P., Mark A. Davidson, Denver, for Intervenors–Appellees Farmers Telephone Company; Haxtun Telephone Company; Peetz Cooperative Telephone Company; Pine Drive Telephone Company; Rico Telephone Company; Roggen Telephone Cooperative Association; Stoneham Cooperative Telephone Corporation; Universal Telephone Company of Colorado; Willard Telephone Company.

Justice MULLARKEY delivered the Opinion of the Court.

The district court consolidated *AviComm, Inc. v. Public Utilities Commission*, No. 96CV341 (Denver Dist. Ct. Sept. 26, 1996), and *Mountain Solutions Ltd. v. Public Utilities Commission*, No. 96CV240 (Denver Dist. Ct. Sept. 26, 1996) to determine whether appellants Mountain Solutions Ltd., Inc. and Denver Direct Dial, L.L.C. (collectively, the "Providers") should be required to purchase telephone services from U S West's Access Service Tariff or be allowed to continue to purchase from U S West's Exchange and Network Services Tariff. The appellants appealed the district court's ruling affirming the decision of the Public Utilities Commission (PUC) that Providers provided "interexchange telecommunications services" as defined by section 40–15–102(12), 17 C.R.S. (1993), and must purchase service from the Access Service Tariff. We have jurisdiction over this appeal pursuant to section 40–6–115(5), 11 C.R.S. (1997). We now affirm the judgment of the district court.

## I.

For telephone purposes, Colorado is divided into geographic regions called "local calling areas."[1] Within those local calling areas, local exchange carriers (LECs) such as U S West, provide unlimited local calling service for a flat monthly fee.[2] When a customer wishes to call beyond his or her local calling area, the call is generally handled by an interexchange carrier (IXC). These interexchange calls are billed at a per-minute charge which the customer pays to the IXC. In turn, the IXC compensates the LEC at the originating and terminating end of the call through payment of "access charges." These access charges are a source of revenue to the LECs which helps defray the cost of providing local exchange service, and are taken into account by the PUC in setting rates.

The Providers in this case sell a service which allows a subscriber to place intrastate telephone calls outside that subscriber's local calling area without incurring long-distance toll charges. This service is possible when two local calling areas partially overlap and a Provider's office is located within the area of overlap. For example, Longmont and Boulder are in the same local calling area. Boulder and Denver are also in the same local calling area, but Denver and Longmont are not. Assume X lives in Longmont and wishes to call Y who lives in Denver. If X calls Y directly, X has made an interexchange call and pays a per-minute charge. If X is a subscriber of a Provider, however, X

---

1. See Rule 2.33 of the Commission's Rules on Telephone Service Providers and Telephone Utilities, 4 CCR 723–2 (1998). Local calling areas are approved by the PUC pursuant to section 40–15–206, 17 C.R.S. (1993).

2. *See* 4 CCR 723–2–2.33 (1998); § 40–15–102(3) 17 C.R.S. (1993).

places a local call to the Provider located in Boulder which uses its computer equipment to forward X's call to Y. Thus, the Provider patches together two local phone calls to make what would otherwise be a toll call. X pays a flat rate to the Provider which is less than the toll rate would be. The Providers charge their customers a flat, monthly rate for this "call transfer service" because no long-distance charge is incurred. The call transfer service is made possible through the use of the Providers' own computers in conjunction with certain purchased U S West services under U S West's Exchange and Network Services Tariff. Thus, the Providers enable their subscribers to make interexchange calls without incurring any long-distance charges.

On October 28, 1994, the Providers filed an Application for Declaratory Order with the PUC pursuant to Rule 60 of the PUC's Rules of Practice and Procedure. *See* 4 CCR 723–1–60 (1996). The Providers sought, *inter alia,* a declaration that the Providers did not provide "interexchange telecommunications services" pursuant to section 40–15–102(12) and thus were not required to purchase services from U S West's Access Service Tariff. Numerous parties intervened including U S West, IXCs, several small LECs, and Avi-Comm, Inc. (AviComm), a company that provides a similar service to that of the Providers' call transfer service.

This matter was referred to an administrative law judge (ALJ), and the Providers and the appellees moved for summary judgment. The ALJ, on summary judgment, concluded that the Providers provide interexchange telecommunications services or the functional equivalent of such services and, as a result, were required to purchase switched access from U S West pursuant to the Access Service Tariff. The ALJ reasoned that if he were to rule otherwise, section 40–15–102 would be in conflict with the anti-discrimination provisions of sections 40–15–105 and 40–3–106(1)(a), 17 C.R.S. (1993).

The PUC adopted these recommendations and held that the Providers were in violation of the Exchange and Network Services Tariff because they resold to customers services which could not be resold by the terms of the tariff. The PUC stated that the Providers could no longer purchase services from the Exchange and Network Services Tariff because allowing them to do so would result in illegal preferences or discrimination. The PUC construed the phrase, "priced based upon usage," in the definition of "interexchange telecommunications services" in section 40–15–102(12) to be merely descriptive and not language which exempted the Providers from the definition. Therefore, the PUC stated, the Providers could be required to purchase services from U S West's Access Service Tariff because they provided "interexchange telecommunications services" as defined by statute or the functional equivalent thereof. The PUC concluded by holding that this matter was an adjudication and not a rule-making procedure. The Providers appealed and the district court affirmed the determinations of the PUC.[3]

## II.

Before we reach the substantive issue in this appeal, we must address three preliminary matters raised by the parties: (1) whether the Federal Telecommunication Act of 1996 preempts state law; (2) whether summary judgment was improperly granted; and (3) whether the PUC engaged in improper rule-making.

## A.

■ The Providers contend that the Federal Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996) (1996 Act), applies in this case and preempts any tariff that is contrary to the 1996 Act. The 1996 Act places on local exchange carriers the "duty not to prohibit, and not to impose unreasonable or discriminatory conditions or

---

**3.** Utilities commissions in other states have reached the same result as the PUC. *See Idaho Local Exch. Cos. v. Upper Valley Communications, Inc.,* Case No. GNR–T–94–1, Order No. 25885, 1995 WL 82345 (Idaho P.U.C. Feb. 3, 1995); *U S West Communications, Inc. v. Bridge Communications, Inc.,* Docket No. 93–049–20, 1994 WL 570650 (Utah P.S.C. Aug. 19, 1994); *In re U.S. Metrolink Corp.,* 103 P.U.R. 4th 194 (Wash. U.T.C.1989); *see also In the Matter of a General Investigation of Digilink,* No. 12.392–U (Kan. Corp. Comm'n Mar. 27, 1995).

limitations on, the resale of its telecommunications services." 47 U.S.C.A. § 251(b)(1) (1991 & Supp.1997).

■ Absent clear legislative intent to the contrary, statutes are given prospective application only. *See Bennett v. New Jersey,* 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985); *Smith v. Colorado Interstate Gas Co.,* 794 F.Supp. 1035, 1038 (D.Colo.1992); 2 J. Sutherland, *Statutes and Statutory Construction* § 41.04 (5th ed.1993). The 1996 Act was enacted long after the 1994 commencement of this proceeding, and as a result, the PUC did not consider the 1996 Act. We hold that the 1996 Act is not applicable to this case.

### B.

■ The Providers argue that the PUC erred in granting summary judgment because disputed issues of material fact existed, namely, whether the Providers "transmit" information as is required to be deemed a telecommunications service. Section 40–15–102(29) defines "telecommunications service" as "the electronic or optical transmission of information between separate points by prearranged means." The Providers contend that the equipment and facilities used for the actual transmission of information belong exclusively to U S West and the record does not support the PUC's determination as a matter of law that the Providers transmit information. This argument is without merit.

■ Summary judgment is a drastic remedy and should only be granted if there is a clear showing that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. *See* C.R.C.P. 56; *Greenwood Trust Co. v. Conley,* 938 P.2d 1141, 1149 (Colo.1997). The moving party has the initial burden to show that there is no genuine issue of material fact. *See Greenwood Trust,* 938 P.2d at 1149. Once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish that there is a triable issue of fact. *See id.* The nonmoving party is entitled to all favorable inferences that may be drawn from the undisputed facts, and all doubts as to whether a triable issue of fact exists must be resolved against the moving party. *See Bayou Land Co. v. Talley,* 924 P.2d 136, 151 (Colo.1996). When a trial court is presented with cross-motions for summary judgment, the court must consider each motion separately, review the record, and determine whether a genuine dispute as to any fact material to that motion exists. *See Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1340 (Colo.1988); *AF Property Partnership v. Department of Revenue,* 852 P.2d 1267, 1270 (Colo.App.1992). The fact that both parties moved for summary judgment does not decrease either party's burden of proof. *See Churchey,* 759 P.2d at 1340.

Therefore, we must consider appellees' motions for summary judgment separately and all doubts must be resolved in favor of the Providers. *See Bayou Land,* 924 P.2d at 151. The Providers acknowledge that the call transfer service is not possible without the use of their equipment. We agree with the ALJ's conclusion which was adopted by the PUC:

> It is clear that appellants provide a service that permits their subscribers to originate and terminate calls between calling areas. These calls are normally toll calls. Although U S West's network is used to originate and terminate the calls, U S West cannot provide the connection between exchanges. There must be some intervention by [the Providers] which they provide through their [premises'] equipment and software. As such, there is transmission of information by electronic means between separate points, even if the transmission is within [a Provider's] office. Without the intervention of [the Providers], such calls could not be electronically transmitted between the calling areas.

We defer to the findings of the PUC and hold that the Providers transmit information and provide "telecommunications service" pursuant to section 40–15–102(29). There is no triable issue of fact.

### C.

■ AviComm raises a preliminary jurisdictional issue. It argues that the PUC

proceeding was a rule-making procedure conducted in violation of the requirements prescribed by Colorado law for agency rule-making. We disagree.

■■■■ The proceeding at issue here was clearly adjudicatory, not rule-making, and we acknowledge that different statutory requirements apply to adjudication and rule-making under the Administrative Procedure Act. *See* ); §§ 24–4–102 to –103, 7 C.R.S. (1997); *City of Aurora v. Public Utils. Comm'n,* 785 P.2d 1280, 1286–87 (Colo.1990). An adjudicative proceeding involves a determination of rights, duties, or obligations of identifiable parties by applying existing legal standards to facts developed at a hearing conducted for the purpose of resolving the particular interests in question. *See Douglas County Bd. of Comm'rs v. Public Utils. Comm'n,* 829 P.2d 1303, 1307–08 (Colo.1992); *City of Aurora,* 785 P.2d at 1287. In contrast, a "rule" is "the whole or any part of every agency statement of general applicability and future effect implementing, interpreting, or declaring law or policy or setting forth the procedure or practice requirements of an agency." § 24–4–102(15). If a proceeding is rule-making, then, the agency must follow the notice, publication, and content requirements detailed in section 24–4–103.

■■■■ We have recognized the reality that "agency proceedings often require application of both rule-making and adjudicatory authority because of the nature of the subject matter, the issues to be resolved, or the interests of parties or intervenors." *Mountain States,* 816 P.2d at 284. In order to determine whether the proceeding constitutes rule-making, we look to the actual conduct and effect of the particular proceeding, as well as to the purposes for which the proceeding was brought. *See id.*

■■■■ Here, the PUC applied existing law to the facts of this case and the decision applied to identifiable parties in a declaratory action brought by the Providers. We realize that the PUC's decision may affect other parties like AviComm which have operations similar to those of the Providers' call transfer service. However, the fact that this decision may have collateral effects upon other pro-

viders similarly situated to the Providers in this case does not transform an adjudicatory action into a rule-making proceeding. "As is often the case in adjudications by the judicial branch, collateral effects to third parties result from adjudicatory proceedings." *Douglas County,* 829 P.2d at 1307.

AviComm cites *Mountain States,* 816 P.2d 278, and *Home Builders Association of Metropolitan Denver v. Public Utilities Commission,* 720 P.2d 552 (Colo.1986), in support of its position. In both cases, this court invalidated PUC adjudicatory decisions because we found that the matters involved rule-making and the PUC did not follow proper rule-making procedures. In *Mountain States,* the PUC initiated the proceeding to determine which telecommunication products and services should be subject to the Intrastate Telecommunications Services Act. *See Mountain States,* 816 P.2d at 284–85. In *Home Builders,* the PUC adopted a new formula applicable to future permanent customers which amended an existing rule. *See Home Builders,* 720 P.2d at 561.

■■■■ However, both of these cases are readily distinguishable from the case at hand. Unlike the proceeding in *Mountain States,* this proceeding was initiated by the Providers, rather than the PUC, through their request for a declaratory order, and AviComm voluntarily intervened in this action. Also the PUC in this case did not amend an existing rule, but rather, applied existing statutory standards. Administrative agencies like the PUC have a certain amount of discretion to exercise their authority through either adjudication or rule-making. *See Charnes v. Robinson,* 772 P.2d 62, 66 (Colo. 1989) (stating that an agency may make policy through adjudication or rule-making, but that the agency's discretion is limited). This case falls within that area of discretion. Absent the Providers' filing of a declaratory action, the PUC could have instituted its own declaratory proceeding, *see Mountain States,* 816 P.2d at 285, or chosen to act through rule-making. Given that this action was filed and there was no on-going rule-making proceeding involving this topic, the PUC acted properly in proceeding to resolve the case before it. The PUC was not required to

dismiss or hold in abeyance the Providers' declaratory action while it initiated a rule-making proceeding. The PUC acted within the bounds of its discretion and we will not overturn its decision for failure to treat this matter as rule-making.

### III.

### A.

■ Before considering the substantive issue raised by the Providers, we will summarize briefly the principles that guide our analysis. Like the district court, our review of a PUC decision is limited to determining whether the PUC has regularly pursued its authority, whether its decision is just and reasonable, and whether its conclusions are in accordance with the evidence. *See* § 40–6–115(3), 17 C.R.S. (1993); *Silverado Communication Corp. v. Public Utils. Comm'n*, 893 P.2d 1316, 1319 (Colo.1995). In this case, there are no disputed factual issues and we are called upon to decide only issues of law. In interpreting the relevant statues and rules, we give due deference to the PUC's interpretation because "[t]he PUC is uniquely qualified through expertise derived from many years of regulating the telecommunications industry to resolve any ambiguities that became apparent in applying the statutory criteria to particular telecommunications services." *Colorado Office of Consumer Counsel v. Mountain States Tel. and Tel. Co.*, 816 P.2d 278, 287 (Colo.1991) (Lohr, J., dissenting); *see also Integrated Network Servs., Inc. v. Public Utils. Comm'n*, 875 P.2d 1373, 1377 (Colo.1994).

■ Several well established concepts of statutory construction also come into play in this case. In interpreting a statute, we must give effect to the intent of the lawmaking body, *see Gambler's Express Inc. v. Public Utils. Comm'n*, 868 P.2d 405, 410 (Colo.1994), and there is a presumption that the General Assembly intends a just and reasonable result, *see* § 2–4–201(1)(c), 1 C.R.S.

(1997); *Colorado–Ute Elec. v. Public Utils. Comm'n*, 760 P.2d 627, 635 (Colo.1988). Thus, a statutory interpretation that defeats the legislative intent or leads to an absurd result will not be followed. *See Conte v. Meyer*, 882 P.2d 962, 965 (Colo.1994). A statute must be read and considered as a whole and should be construed to give consistent, harmonious, and sensible effect to all of its parts. *See Gambler's Express*, 868 P.2d at 410. Finally, although we must give effect to the statute's plain and ordinary meaning, *see Colorado Office of Consumer Counsel v. Public Utils. Comm'n*, 752 P.2d 1049, 1052 (Colo.1988), the intention of the legislature will prevail over a literal interpretation of the statute that leads to an absurd result, *see Rodriguez v. Schutt*, 914 P.2d 921, 925 (Colo. 1996); *People v. Bowman*, 812 P.2d 725, 728 (Colo.App.1991). With this background in mind, we turn to the substantive issue raised by the Providers.

### B.

■ The Providers contend that they do not provide "interexchange telecommunications services" pursuant to section 40–15–102(12) and thus, are not required to purchase services from U S West's Access Service Tariff. We reject this argument.

■ Tariffs are the means by which utilities record and publish their rates along with all policies relating to the rates. *See* § 40–3–103, 17 C.R.S. (1993); *U S West Communications, Inc. v. City of Longmont*, 948 P.2d 509, 516 (Colo.1997). Tariffs are legally binding, *see Longmont*, 948 P.2d at 517,[4] and the proper application of rates and tariffs is within the regulatory authority of the PUC. *See* § 40–3–102, 17 C.R.S. (1993); *Silverado*, 893 P.2d at 1320.

In this case, there are two tariffs at issue: 1) the Exchange and Network Services Tariff, Colorado P.U.C. No. 8 (Exchange Tariff), which provides for flat-rate local telephone services; and 2) the Access Service Tariff, Colorado P.U.C. No. 16 (Access Tariff),

---

4. In *Longmont,* we held that a tariff was not a "statute" for the purposes of abrogating the common law rule requiring utility companies to pay for relocation costs that was stated in *City & County of Denver v. Mountain States Telephone &*

*Telegraph Co.,* 754 P.2d 1172 (Colo.1988). *See Longmont,* 948 P.2d at 518. However, we noted as a general proposition that tariffs are legally binding. *See id.* at 517.

which provides for regulated or usage-based rates that are generally more expensive than flat-rate service. The Providers currently buy their flat-rate services from U S West pursuant to the Exchange Tariff.

Generally, an IXC operating within U S West's service area can connect to the IXC's subscribers only by purchasing service pursuant to U S West's Access Tariff under rate terms that are usage-sensitive. The Access Tariff furnishes "switched access services" to businesses that supply "interexchange telecommunications services." *See* Access Tariff. Section 40–15–102(28) defines "switched access" as "the services or facilities furnished by a local exchange company to interexchange providers which allow them to use the basic exchange network for origination or termination of interexchange telecommunications services." Section 40–15–102(12) of the Intrastate Telecommunications Services Act, *see* §§ 40–15–101 to –404, 17 C.R.S. (1993) (the Act), states:

" Interexchange telecommunications services" means telephone services, not included in basic local exchange service, and which are priced based upon usage.

The Providers contend that they do not provide "interexchange telecommunications services" pursuant to section 40–15–102(12) because they charge a flat rate for their services, and do not price their services "based upon usage."

The PUC rejected the Providers' argument. It determined that the price "based upon usage" language of the statute was not an essential element defining interexchange telecommunications services, but rather, that the term was descriptive in nature. According to the PUC, the interexchange telecommunications services available in 1987 when the statute was drafted were priced based on usage and the statutory language simply reflected that fact. Under the PUC's reasoning, the key question is whether the telephone service offered by the Providers is "not included in basic local exchange service." Here, there is no dispute that the Providers' service is "not included in basic local exchange service." But for a Provider's ability to patch together two local telephone calls by locating its business in the overlap zone between two local calling areas, the completed telephone call would be beyond the caller's local exchange. For these reasons, the PUC found that the Providers were engaged in supplying interexchange telecommunications services.

None of the parties has pointed us to any legislative history regarding section 40–15–102(12) and our own research has disclosed nothing relevant. This provision was added when the article was repealed and reenacted in 1987. *See* ch. 313, sec. 1, § 40–15–102, 1987 Colo. Sess. Laws 1476, 1477–79.

■ Whether interexchange services in 1987 were priced based on usage clearly is a matter within the PUC's expertise, and this court will defer to the agency's expertise on the 1987 pricing practice. Further, we are persuaded by the logic of the PUC's conclusion that the statutory reference to pricing based on usage is intended to be descriptive rather than an essential element of the statutory definition.

To reach the opposite conclusion and to construe flat-rate pricing as dispositive would lead to absurd results. As we will demonstrate below, this is true for two reasons. First, any such pricing requirement could be easily circumvented as the Providers have done here. Second, the Providers' proposed interpretation would conflict with other relevant statutory provisions.

With respect to the first point, we note that the Providers are able to price their service at a flat rate only because they are violating the terms of the Exchange Tariff. The Exchange Tariff includes several restrictions on use of the business service including a restriction limiting use to certain parties: the customer, the customer's immediate family, the customer's employees and representatives, a communications common carrier in the provision of overseas data message service, customers who share local exchange service, joint users, and telephone answering service. *See* Exchange Tariff § 2.2.1.C.1.a. The PUC found, and the Providers do not dispute, that the Providers' customers are general subscribers who do not fall within any of the listed categories. Additionally, the Providers violate the Exchange Tariff's

prohibition on the resale of the flat-rate trunk-lines. Exchange Tariff section 2.2.5 states that the service "shall not be used for performing *any part* of the work of transmitting, delivering, or collecting any message where any toll or consideration has been or is to be paid any party other than [U S West]." (Emphasis added.) The PUC found, and the Providers do not dispute, that the Providers' call transfer service constitutes a prohibited resale of services to the Providers' customers. *See Integrated Network Servs.*, 875 P.2d at 1381–82 (holding resellers are subject to measured, rather than flat, rates). Thus, if the Providers are correct that the method of pricing is dispositive, they cannot meet their own test because they cannot lawfully charge a flat rate for their services.

Second, as stated above, if we were to accept the Providers' argument, absurd results would follow including logical inconsistencies between the definitions in the statute. "Interexchange provider" is defined as "a person who provides telecommunications services between exchange areas" and "telecommunications service" is "the electronic or optical transmission of information between separate points by prearranged means." § 40–15–102(11), (29). Because the Providers transmit information between exchange areas, Providers are clearly "interexchange providers of telecommunications services." If we were to agree with the Providers' argument that they do not provide "interexchange telecommunications services," the resulting absurdity is that the Providers would be "interexchange providers of telecommunications services," while not providing "interexchange telecommunications services."

Moreover, allowing the Providers to continue purchasing from the U S West Exchange Tariff rather than the Access Tariff would raise the specter of discrimination among IXCs contrary to sections 40–15–105(1)[5] and 40–3–106(1)(a)[6], 17 C.R.S. (1993). Both sections prohibit U S West from granting any preference or special advantage as to its services.[7]

The Providers assert that U S West provides three identical services to the Providers' call transfer service and those services are not provided pursuant to the Access Tariff. The three services are Foreign Exchange Service (FES), Emergency Foreign Exchange Service (EFES), and Market Expansion Line Service (MEL). FES and EFES are offered by U S West through its Private Line Transport Services Tariff, Colorado P.U.C. No. 14 sections 5.3.8, 5.3.9, while MEL is available through the Exchange Tariff section 5.4.4. The Providers originally contended before the PUC that the ALJ's decision would have unintended negative consequences on these three services, but this argument has been abandoned on appeal.

The PUC, however, found that these three U S West services are not comparable to the Providers' service. There is no evidence in the record to support the Providers' contention of comparability and the parties rely

---

5. Section 40–15–105(1) provides:

   (1) No local exchange provider shall, as to its pricing and provision of access, make or grant any preference or advantage to any person providing telecommunications service between exchanges nor subject any such person to, nor itself take advantage of, any prejudice or competitive disadvantage for providing access to the local exchange network. Access charges by a local exchange provider shall be cost-based, as determined by the commission, but shall not exceed its average price by rate element and by type of access in effect in the state of Colorado on July 1, 1987.

6. Section 40–3–106(1)(a) provides:

   (1)(a) Except when operating under paragraph (b) of this subsection (1) or pursuant to article 3.4 of this title, no public utility, as to rates, charges, service, or facilities, or in any other

respect, shall make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any respect, either between localities or as between any class of service. The commission has the power to determine any question of fact arising under this section.

7. Additionally, the PUC stated that the Providers may also be fraudulently using U S West's services, *see* Exchange Tariff, section 2.2.9.A.5, and may be avoiding contributing to the High Cost Fund, *see* § 40–15–208, 17 C.R.S. (1993). The PUC also found that the Providers violate section 40–15–206, 17 C.R.S. (1993), because the Providers' service expands its subscribers' local calling areas without PUC approval. Because of our holding, we need not address these findings.

solely on U S West tariffs appended to the appellate briefs to explain how the three U S West services operate. Interpretation of the tariffs is a matter within the PUC's expertise, and we have no basis to overturn the PUC's finding on comparability. Moreover, because of the very nature of tariffs, the inclusion of MEL, FES, and EFES in the tariffs means that subscribers to these services pay rates which properly compensate U S West for its costs. Thus, regardless of whatever technological similarities may exist among the three U S West services and the Providers' service, the critical difference is that the Providers' service does not adequately compensate U S West for its costs because the Providers do not use the Access Tariff. For these reasons, we agree with the PUC that the call transfer service offered by the Providers is not comparable to MEL, FES, and EFES.

Finally, the Providers' argument is inconsistent with the legislative declaration of the Act which states that one of its purposes is "guaranteeing the affordability of basic telephone service" while fostering free market competition. *See* § 40–15–101, 17 C.R.S. (1993). Access charges are a source of revenue which helps defray the cost of providing local exchange service. Allowing the Providers to avoid paying their fair share of access costs ultimately would raise the rates of all subscribers of local exchange service.

In summary, we hold that in accordance with the applicable tariffs and statutes, the Providers provide "interexchange telecommunications services" within the meaning of the statute and cannot continue to purchase access from the Exchange Tariff. Allowing the Providers to continue to purchase from the Exchange Tariff would lead to logical inconsistencies between definitions and violations of Colorado law. We agree with the district court which stated that to hold otherwise would "exalt form over substance by suggesting that the billing procedure for a service, rather than the service itself, should determine the nature of the service."

## IV.

For these reasons, we uphold the PUC's determination to deny the relief requested by the Providers in their Application for Declaratory Order. As a result, the Providers must comply with all applicable tariffs, specifically the Access Service Tariff. Accordingly, the judgment of the district court is affirmed.

SCOTT, J., dissents.

JUSTICE SCOTT dissenting:

I agree with the majority that in following "concepts of statutory construction ... we must give effect to the intent of the lawmaking body." Maj. op. at 1031. However, the "lawmaking body" in this case is the General Assembly and not the Public Utility Commission (PUC), whose "powers are not unlimited." *Consumer Counsel v. Mountain States Tel.*, 816 P.2d 278, 283 (Colo.1991). The legislative enactment, section 40–15–102(12), 17 C.R.S. (1993), limits the PUC's authority. Therefore, in my view, the only proper venue to alter section 40–15–102(12) so as to strike out the "based on usage" clause from the definition, is the General Assembly and not the PUC or this court. Thus, I do not join the judgment of the majority.

While I share the majority's view that the PUC was not required to conduct a rulemaking proceeding in order to resolve the issues raised by Avicomm, Inc., Mountain Solutions, Ltd., Inc., and Denver Direct Dial, LLC (Collectively, the "Providers"), I believe the Providers' practice of "bridging" local exchange service areas does not constitute an offering of "interexchange telecommunications service" within the plain meaning of section 40–15–102(12). In addition, I would require the PUC to consider the effect of the resale provisions of the Telecommunications Act of 1996 on the legality of U S West's Exchange and Network Services Tariff.

Accordingly, I would reverse and remand this matter to the PUC for further proceedings.

## I.

By using services purchased under the Exchange and Network Services Tariff to switch traffic that crosses local exchange area boundaries, the Providers avoid paying

access charges to U S West.[1] However, the fact that the practice of "bridging" local exchange areas is obviously intended to allow the Providers to exploit a statutory loophole in order to circumvent the PUC's access charge rules is not relevant to the resolution of this case.

In interpreting a statute, we attempt to determine what the General Assembly intended in adopting the statutory language under review. *See City of Westminster v. Dogan Constr. Co.*, 930 P.2d 585, 590 (Colo. 1997). Where the terms used by the General Assembly are clear, though, consideration of extrinsic "indicia of legislative intent" is inappropriate, and the "[w]ords should be given effect according to their plain and ordinary meaning." *Id.*

Our task is not to determine whether the General Assembly would have included the Providers' services within the definition of "interexchange telecommunications services" established by section 40–15–102(12) if it had considered the possibility that such services might be offered on a flat-rate basis. Instead, we must decide whether the definition actually incorporated into the statute is broad enough to include the Providers' services. I submit that the definition, which provides that "interexchange telecommunications services" are "priced based upon usage," plainly does not include any service not priced based upon usage.

The majority avoids the plain meaning of the words in section 40–15–102(12) by resort to the principle that statutes should not be construed in such a way as to produce "absurd" results. *See* maj. op. at 1031. The fact that a citizen can avoid the reach of the PUC's regulatory authority, however, does not make the statutory meaning "absurd." For example, individuals and businesses often structure their affairs in such a way as to avoid the obligation to pay assessments imposed by the tax code, but the courts do not rewrite the tax statutes in order to ensure that revenue collections meet assumed legislative expectations.[2] These efforts are neither legally nor morally blameworthy. Yet, if a citizen's actions permitted by the statute are inconsistent with the purpose of the legislation, the legislature, and not this court, must act to amend the tax laws. As Learned Hand observed half a century ago: "[T]here is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everyone does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant." *Commissioner v. Newman*, 159 F.2d 848, 850–51 (2d Cir. 1947).

Here, while it may be difficult to accept, the law and its reach are not necessarily coterminous with morality, or even the "logic of the PUC's conclusion." Maj. op. at 1032.

The majority contends that the plain meaning of the words used in section 40–15–102(12) is "inconsistent" with other definitions in the telecommunications statute. Section 40–15–102(11) defines "interexchange provider" as a "person who provides telecommunications services between exchange areas," and section 40–15–102(29) says "telecommunications service" is "the electronic or optical transmission of information between separate points by prearranged means." The majority reasons that under these definitions, the Providers are "interexchange providers of telecommunications service."

I see two problems with this reasoning. First, if the meaning of the phrase "interexchange telecommunications services" can be inferred by reference to the definitions of "interexchange provider" and "telecommunications service," then section 40–15–102(12)

1. These access charges are designed to allocate the costs associated with building, maintaining, and operating U S West's network between consumers who make calls within their own local exchange service area to consumers who place calls across local exchange area boundaries. The access charge regime is based on the assumption that calls within a single local exchange service area will be subject to flat-rate pricing while calls that cross local area boundaries will be priced on a per-use basis.

2. The analogy to tax planning is closer than it may appear, because the access charges are in effect a "tax" on certain kinds of calls, i.e., calls that cross local exchange area boundaries, designed to subsidize others kinds of calls, i.e., calls within a single calling area.

is surplusage, a conclusion to be avoided under basic principles of statutory construction. *See Bennett Bear Creek Farm Water and Sanitation Dist. v. City and County of Denver*, 928 P.2d 1254, 1262 (Colo.1996). Second, the words and phrases used in statutes are often terms of art. We should not intervene to amend the statute by judicial fiat simply because the General Assembly has given a term a special—and perhaps even counterintuitive—definition.

In planning their business strategies, regulated business enterprises should be entitled to rely on the plain meaning of the words used in the statutes governing their activities. In light of the unambiguous definition established by section 40–15–102(12), I would hold that call transfer services are not "interexchange telecommunications services." [3]

Unfortunately, by our judgment today, we require firms regulated by the PUC not only to comply with the plain meaning of the statute's defined terms, but to anticipate the "logic of the PUC[ ]" without notice, even when, as here, that logic is not consistent with the plain language adopted by the General Assembly.[4]

## II.

The majority observes that "the Providers are able to price their service at a flat rate only because they are violating the terms of the Exchange Tariff." Maj. op at 1032. The majority, however, simply assumes that the restrictions in the tariff are valid while refusing to consider the implications of the Tele-

communications Act of 1996, Pub.L. No. 104–104, 110 Stat 56 (1996).

Section 251(b)(1) of the Act provides that a local exchange carrier may not "prohibit ... [or] impose unreasonable or discriminatory conditions or limitations on ... the resale of its telecommunications services." 47 U.S.C. § 251(b)(1). On its face, this provision appears to prohibit U S West from forbidding resale of the services offered under its Exchange and Network Services Tariff. Under the 1996 Act, resale restrictions are presumptively unreasonable whether they are contained in a resale agreement or in a tariff filed with the PUC. *See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket No. 96–98, *First Report and Order*, 11 FCC Rcd. 15499 at ¶ 939 (FCC Aug. 8, 1996); *vacated sub nom. Iowa Utils. Bd. v. Federal Communications Comm'n*, 120 F.3d 753 (8th Cir.1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998).

It is by no means apparent to me that the duty imposed by section 251(b)(1) is limited to situations where a reseller seeks to provide only basic local services as opposed to competitive services, as U S West suggests. In any event, I think the PUC should examine this issue in the first instance. If the resale restrictions are allowed, the PUC should come forward with a principled legal basis for distinguishing legitimate limits allowed by the 1996 Act from unreasonable and discriminatory conditions forbidden by the statute. Otherwise, competitors who

---

3. The cases cited by the majority to show that other states concur in its analysis, *see* maj. op. at 1028 n.3, are not on point. For example, in *Idaho Local Exchange Companies v. Upper Valley Communications, Inc.*, Case No. GNR–T–94–1, Order No. 25885, 1995 WL 82345 (Idaho P.U.C. Feb. 3, 1995), the service provider charged customers for each call, putting the service within the statutory definition of interexchange service, which expressly included a "per-unit" pricing requirement. The other cases cited, *US West Communications, Inc. v. Bridge Communications, Inc.*, Docket No. 93–049–20, 1994 WL 570650 (Utah P.S.C. Aug. 19, 1994), and *In re U.S. Metrolink Corp.*, 103 P.U.R. 4th 194, 1989 WL 418657 (Wash.U.T.C.1989), do not appear to have interpreted any similar statutory definition.

4. The PUC's approach to interpreting section 40–15–102(12), is reminiscent of a famous colloquy on the meaning of language:
     "When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."
     "The question is," said Alice, "whether you *can* make words mean different things."
     "The question is," said Humpty Dumpty, "which is to be master—that's all.... They've a temper, some of them—particularly verbs, they're the proudest—adjectives, you can do anything with, but not verbs—however, *I* can manage the whole lot!"
  Lewis Carroll, Through the Looking Glass 198 (Julian Messner 1982). In this case, PUC becomes the master of the statute, managing the whole lot in ways contrary to the plain language.

seek to provide other types of telecommunications service may be frustrated in their efforts to resell tariffed offerings.

The PUC's decision in this case was mailed on January 10, 1996, less than a month before the 1996 Act became law. Although the PUC was free to issue its decision without regard to the imminent enactment of a federal statute with potentially preemptive consequences, *see Arapahoe County Public Airport Authority v. Centennial Express Airlines, Inc.*, No. 97SC123 slip op., 956 P.2d 587 (Colo.1998), I would remand for consideration of the effect of federal law in the context of further proceedings conducted for the purpose of applying what I see as the correct definition of "interexchange telecommunications services." [5]

### III.

Accordingly, because the plain language of the statute serves not only to give the regulated notice but also to limit the authority of the regulator, I respectfully dissent.

[5] The majority correctly notes that the 1996 Act has a purely prospective application, but the issue *to be decided concerns ongoing, i.e., pro*spective, conduct by both the Providers and U S West.