**Loretta SCHWANKL, Petitioner**

v.

**Robert Olen DAVIS, Respondent.**

**No. 02SC810.**

Supreme Court of Colorado,
En Banc.

Feb. 23, 2004.

Holland & Pagliuca, P.C., Jeffrey S. Pagliuca, Heather R. Hanneman, Denver, Colorado, Attorney for Petitioner.

Arrington & Associates, P.C., Barry K. Arrington, Golden, Colorado, Attorney for Respondent.

John Faught & Associates, P.C., John D. Faught, Denver, Colorado, Attorneys for Amicus Curiae Kempe Children's Foundation.

Holland & Hart, LLP, Susannah W. Pollvogt, A. Bruce Jones, Denver, Colorado, Attorneys for Amici Curiae Colorado Coalition Against Domestic violence, Colorado Coalition Against Sexual Assault, and Colorado Organization for Victim Assistance.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

In this case, we interpret a "Good Samaritan" statute, section 16–3–203 of the Colorado Revised Statutes, which awards court costs and attorney fees to anyone who has successfully defended against a lawsuit resulting from that person "having sought to prevent a crime being committed against any other person." § 16–3–203, 6 C.R.S. (2003). We hold that this statute not only protects people who attempt to stop a crime already underway, but also encompasses people who seek to prevent future crimes. We further hold that to qualify for protection under this statute, a person must have believed in good faith that a crime was being or would be committed, and that if this requirement is met, the statute is effective even if no crime actually took place. Because Loretta Schwankl, the successful defendant in the defamation case below, acted in good faith to prevent what she believed to be an ongoing, repetitive crime, we reverse the court of appeals decision in *Davis v. Schwankl,* 70 P.3d 509 (Colo.App.2002).

## II. Facts and Procedural History

On August 9, 1999, at about 1:35 A.M., Loretta Schwankl and her husband were awakened by a verbal disturbance—a man shouting and a woman moaning—emanating from the Davises' house across the street. Schwankl did not call the authorities immediately. Over the course of the following day, however, Schwankl continued to be concerned about the incident, especially in light of the fact that Davis's wife had once allegedly told Schwankl that Davis had been committing "unnatural acts" with the Davises' daughter.[1]

Finally, after seeking advice from a battered women's hotline, Schwankl decided to call the police so that the authorities could perform a welfare check on the Davis family. During the phone call to the police, Schwankl said: "I think there might be domestic violence, but also some sexual violence going on . . . and I can't just sit back and, and know that there are two children there." In response, the Wheat Ridge Police Department and Department of Social Services performed welfare checks on the Davis family and determined that there was no abuse taking place.

Following the incident, Davis sued Schwankl for defamation and outrageous conduct, seeking more than $300,000 in damages.[2] After a lengthy discovery process and a three-day trial, a jury ruled in favor of Schwankl, finding that she had not published statements about Davis, that her statements were substantially truthful, and that she had acted in good faith. The jury also found that Schwankl's behavior was not willful, wanton, and malicious.

Schwankl's trial court costs were $6,910.78, and her attorney fees totaled $76,960. The trial court awarded Schwankl court costs and attorney fees under section 16–3–203, which states:

Any person who is not a peace officer . . . who is made a defendant in any civil action as a result of having sought to prevent a crime being committed against any other person, and who has judgment entered in

his favor shall be entitled to all his court costs and to reasonable attorney fees incurred in such action.

Davis did not challenge the award of court costs, but appealed the shift of attorney fees, and the court of appeals held in his favor, saying that section 16–3–203 applies only when the successful litigant acted during the "exigent circumstance" of a "crime in progress" and only if the litigant proves that a crime actually occurred, i.e., that each element of the crime was committed. *Davis v. Schwankl*, 70 P.3d at 511. Thus, because Schwankl did not make her phone call to the police during the "exigent circumstance" of the "crime in progress" and because the police and social services found that no crime actually occurred, the court of appeals held that she was not eligible to receive attorney fees under section 16–3–203. *Id.* at 511–12.

We granted Schwankl's petition for writ of certiorari to decide: (1) whether the benefits of the attorney fee provision in section 16–3–203 are limited only to a successful defendant who can show that her actions to prevent a crime were taken during the "exigent circumstances" of a "crime in progress" and (2) whether the successful litigant must prove that each element of a crime was committed in order to collect the attorney fees.

## III. Analysis

We hold that section 16–3–203 shifts payment of the defendant's court costs and reasonable attorney fees to the plaintiff when the defendant prevails and the trial court finds that the defendant acted in good faith to prevent what she thought was a current or future crime. We base our holding upon the language of the statute, and note that legislative history, public policy, and surrounding statutes all support our interpretation.

Davis argues, and the court of appeals agreed, that the words "crime being committed" plainly mean that section 16–3–203 only applies to the "clear and exigent circumstance" of a crime "in progress." *Davis v. Schwankl*, 70 P.3d at 511–12. This reasoning creates a two-part test that must be satisfied

---

1. Davis's wife later denied making this statement to Schwankl.

2. The trial judge dismissed the outrageous conduct claim for failure to state a claim.

to award attorney fees and costs to someone who sought to prevent a crime. The citizen who intervenes would be entitled to court costs and attorney fees *only if* the intervenor could prove that: (a) there was a crime, as defined by statute, taking place, and (b) that crime was in progress at the time of intervention. The bystander could not recover costs and fees if she was acting to prevent a future crime, no matter how imminent or probable that future crime might be. Nor could the bystander recover if any elements of the statute defining the crime were not fulfilled. To examine the court of appeals' decision we first address the requirement that the crime be in progress at the point of intervention, and we then turn to the requirement that each element of a crime be satisfied.

### 1. Whether Section 16–3–203 Protects People Who Act to Prevent a Future Crime

We begin our analysis with the statute itself. Section 16–3–203 awards court costs and attorney fees to a person who "sought to prevent a crime" but later prevails in a resulting lawsuit. The common meaning of the word "prevent" is "to keep from occurring," "to hinder or stop from doing something," or to "forestall." *Webster's Encyclopedic Unabridged Dictionary* 1535 (deluxe ed.2001). According to these common definitions, the ordinary meaning of the words "to prevent a crime" is to keep a crime from occurring, to stop a crime, or to hinder a crime. Therefore, according to section 16–3–203, a person who seeks to prevent a future crime is eligible for court costs and attorney fees just as a person who intervenes during the commission of a crime in progress is eligible for these benefits.

Under Colorado law, the present tense of statutory language also includes the future tense. § 2–4–104, 1 C.R.S. (2003) ("Words in the present tense include the future tense."). Thus, according to our codified method of statutory interpretation, "crime being committed" includes present as well as future crimes.

Even without this statutory rule, we read section 16–3–203 to encompass future crimes.

The court of appeals focused almost exclusively on the words "crime being committed," dismissing the importance of the word "prevent." This court has said that a "statute must be read and considered as a whole and should be construed to give consistent, harmonious, and sensible effect to all of its parts." *AviComm, Inc. v. Colo. Public Utils. Comm'n*, 955 P.2d 1023, 1031 (Colo.1998). Consequently, we must examine the entire relevant phrase: "sought to prevent a crime being committed against any other person." In context, this phrase logically breaks down into two segments: "sought to prevent a crime" and "being committed against any other person." When viewed in this manner, it becomes clear that the first segment requires that the citizen who intervened was seeking to prevent a crime, and the second segment requires that the crime is one that is perpetrated against another person. Under this analysis, the words "being committed" merely lead into the phrase "against any other person" and do not imply that "crime" be interpreted strictly in the present tense. Moreover, other states have used the phrase "being committed against" in reference to ongoing, repetitive crimes such as fraud, abuse, and stalking. *See, e.g.,* Cal. Prob. Code § 2952 (West 2003) (fraud or misrepresentation against the elderly); Md.Code Ann., Fam. Law § 14–305 (2003) (abuse, neglect, or exploitation against a vulnerable adult); Nev.Rev.Stat. 200.591 (2003) (stalking, aggravated stalking, or harassment).

We acknowledge that, under this interpretation, the words "being committed" are not technically necessary in the phrase "sought to prevent a crime being committed against any other person"; however, inserting the word "committed" is a common convention in the Colorado statutes. *See, e.g.,* Colo. Const. art. II, § 19 ("felony sexual assault committed against a child"); § 6–1–112, 2 C.R.S. (2003) ("violation was committed against an elderly person"); § 13–90–107, 5 C.R.S. (2003) ("a crime committed against the communicating minor child"); § 16–1–104, 6 C.R.S. (2003) ("crime committed against an elderly person"); *see also* §§ 16–4–201.5, –6–201; § 17–22.5–405; §§ 18–1.3–104, –201, –302, –1201, –1302; §§ 18–1.4–102, –3–203, –

6.5–101, –6.5–104; § 27–10–120. Because of the convention of using the phrase "crime committed against" rather than simply saying "crime against" we do not grant the word "committed" any special meaning in the statute at hand. Hence, we find nothing in the language of section 16–3–203 that limits its application to the "exigent circumstance" of a "crime in progress."

### 2. Whether the Defendant in a Civil Suit Must Prove That a Crime Actually Occurred

Next, we turn to the second issue. When someone intervenes to prevent a future crime, the alleged perpetrator of the crime may not yet have completed that crime, and in fact, may not have even begun the actual crime. Thus, we disagree with the court of appeals on the second issue as well: no actual crime need occur before section 16–3–203 applies. Instead, the statute requires that an intervenor who later wins a resulting lawsuit must have "sought to prevent a crime" in order to recover costs and fees. We hold that this phrase requires that the intervenor must have had a subjective, good faith belief that her action would prevent a crime. If the person seeking to prevent a suspected crime is, in fact, mistaken about the existence of a crime, but acted in good faith, she is still eligible for the protection of this statute.

To require that an intervenor be absolutely certain that a statutory crime is or will soon be committed is an unreasonable requirement that would frustrate the intent of the statute. Although average citizens may be generally familiar with most of Colorado's crimes, they certainly do not know all of the elements of each crime. Neither do most citizens know what legally constitutes criminal attempt. Hence, a person who sought to prevent a crime should not be required to prove that all elements of a crime were committed. Instead, before a person can recover court costs and attorney fees under section 16–3–203, the fact-finder in the trial court must determine that the person acted in good faith.

Furthermore, the court of appeals' interpretation of section 16–3–203 would require that the intervenor prove that all elements of the crime were satisfied, but that the alleged perpetrator was still in the process of committing the crime at the moment of intervention.[3] This approach would not only significantly add to the burden of the litigant at trial, in that she must prove each and every element of the crime, but would also so narrow the applicability of the statute that it would be practically ineffective. Anyone who seeks to stop a crime just a moment too early, before the perpetrator has committed all elements of the crime, would not be covered; nor would someone who acted just a moment too late, after the crime was completed. Likewise, someone who seeks to prevent a crime of a recurring nature, such as domestic violence, child abuse, identity theft, or embezzlement would not be covered by section 16–3–203 unless she acts to prevent the crime exactly at a moment when the perpetrator is carrying out an illegal episode. Moreover, someone who, in good faith, reports a future crime that is still only in the planning phase would not benefit from section 16–3–203.

In sum, we hold that when a person who acts in good faith to prevent either a current or future crime against any other person wins a civil suit, which results from the person's intervention, that person is entitled to recover court costs and reasonable attorney fees under section 16–3–203.

### 3. The Purpose of the Statute

Our interpretation of section 16–3–203 supports the goals that the General Assembly embodied in this statute—to protect people who seek to prevent crimes from spending large sums of their own money defending against the resulting unfounded lawsuits against them. *See AviComm*, 955 P.2d at 1031 (saying that "there is a presumption that the General Assembly intends a just and reasonable result"). The ultimate purpose is two-fold: to encourage people to get involved in preventing crimes against others, and to discourage retaliatory law-

---

**3.** We recognize that attempt is also a crime; however, we still reject the court of appeals' interpretation as too narrow to achieve any rational purpose.

suits. These purposes are easily discerned from the language of the statute itself, yet the court of appeals' interpretation frustrates these goals.

Although the General Assembly's intent is obvious from the statute itself, we note that the legislative history also reinforces our interpretation. According to the legislative history, the General Assembly enacted section 16–3–203 to "encourage someone who witnesses a crime to either report it or to participate in putting an end to it" and to "encourage people to be a bit involved." *See* House of Rep.2d Reading of H.B. 77–1403, 51st Gen. Assembly, 1st Reg. Sess. (May 21, 1977) (statement of Rep. Zakhem, the bill's prime sponsor). Awarding court costs and attorney fees to someone who sought in good faith to prevent a future crime does just this. It attempts to rectify the scenario in which the alleged perpetrator of the crime brings a costly lawsuit in order to punish the person who interfered with his apparently illegal activity. Because of the reduced risk of having to pay high costs and fees as a result of reporting ongoing crimes, legislators hoped that citizens would feel more inclined to get involved and prevent future crimes.

Moreover, as the record reflects, the language of the original bill introduced in the House of Representatives called for reimbursement of litigation expenses for people being sued for trying to "prevent an assault against any person." This language did not limit the applicability to assaults already in progress, but instead included any assault, future or present. *Id.* Prior to enactment, the General Assembly only broadened the language to include any crime against a person instead of limiting the crime to assault, and did not express any intent to limit the timeframe to a crime already underway.

Davis argues that legislators acknowledged that this law would only apply in rare situations, and that it should consequently be narrowly construed. Indeed, during the floor debate of the bill, an opposing legislator urged that the bill "doesn't do anything." *See* House of Rep.2d Reading of H.B. 77–1403, 51st Gen. Assembly, 1st Reg. Sess. (May 21, 1977) (statement of Rep. Durham). In response, the bill's sponsor agreed that

the law would have a limited practical application, but argued that "if it did only that—to encourage someone to stop a crime from happening or a rape or whatever—I think it would have served a great purpose." *Id.* (statement of Rep. Zakhem).

We disagree with Davis. When taken in context, the legislators' comments about the limited applicability of this bill refer to the fact that an alleged perpetrator of a crime would rarely sue the person who attempted to stop the crime. Because the legislators knew that this is a rare occurrence, they thought it would be unlikely that a person would refrain from preventing a crime out of the fear of the costs of a lawsuit. Under this reasoning, it would be even rarer that a person who is hesitant to intervene would be persuaded to do so simply because he realizes that he would recover court costs and attorney fees if he is sued as a result of his action. The fact that this is the first appellate decision interpreting a statute enacted in 1977 shows that it is not commonly applied.

In sum, lawmakers were not implying that this law would have narrow applicability because a person must intervene during the "exigent circumstances" of an actual crime in progress. To the contrary, lawmakers were referring to the rarity with which this statute would actually impact a citizen's decision about whether to intervene. Thus, our interpretation satisfies the intent of the General Assembly when it enacted this statute.

■ Policy reasons also support our decision. Recurrent crimes such as domestic violence, child abuse, identity theft, and embezzlement are secretive, ongoing, and repetitive in nature. Also, some serious crimes involve a long planning process during which time some people may become suspicious and mentally debate whether to notify the authorities. Getting involved in one of these situations by notifying the authorities of suspected wrongdoing requires time and energy, and presents risks of retaliation. One method of retaliating is filing an expensive lawsuit. This statute seeks to reduce this risk of intervening in a crime by shifting the costs of an unfounded lawsuit to the person bringing the suit so that people might be more willing

to get involved and help prevent evils of all sorts, including ongoing crimes.

Finally, our interpretation of section 16–3–203 harmonizes with section 16–3–202(4), which provides immunity from civil liability for any citizen who, in good faith, reports "the commission or suspected commission of any crime or [gives] other information to aid in the prevention of any crime." § 16–3–202(4), 6 C.R.S. (2003). That statute, which was passed in the same legislative session as section 16–3–203, protects people who report crimes, either before or after the fact, from civil liability. Section 16–3–203, however, adds to the protection of 16–3–202(4) in that it also reimburses the costs of defending against a lawsuit if the defendant prevails. However, it only applies in the case that a person acted to prevent a crime, not if the person reported a past crime. Section 16–3–203 is an extra benefit for people who take the initiative to prevent crime, whether they do so by intervening in a crime in progress or acting to prevent a future crime from occurring. Because acting to prevent a crime is a step beyond reporting a past crime, and involves additional risks, section 16–3–203 adds reimbursement of court costs and attorney fees to the immunity from civil liability that people who report crimes receive.

## IV. Application

In the case at hand, the Wheat Ridge Police Department and Department of Social Services investigated and found no evidence of domestic violence or child abuse at the Davis household. In Davis's ensuing lawsuit against Schwankl, however, the jury found that Schwankl reported the suspected crimes in good faith and that Schwankl's action was not "willful, wanton, and malicious." Moreover, Schwankl was attempting to stop domestic violence and child abuse—crimes that are frequently secretive and repetitive. In her call to the police, she stated that "I think there might be domestic violence, but also some sexual violence going on" and that there were "multiple concerns." Although the alleged incident on August 9, 1999, triggered Schwankl's call, she ultimately acted because she believed that the events had occurred multiple times and would continue occurring if the authorities did not step in. Thus, after speaking with a domestic violence counselor, she decided to call the police to prevent future episodes that she believed could endanger Davis's wife or children.

Because Schwankl acted in good faith to prevent what she believed to be future crimes against other people, and she successfully defended herself in a defamation suit arising from her intervention, she is entitled to court costs and reasonable attorney fees under section 16–3–203. Therefore, we reverse the court of appeals.

## V. Conclusion

We reverse the court of appeals' decision, *Davis v. Schwankl*, 70 P.3d 509 (Colo.App. 2002), and hold that section 16–3–203 benefits people who successfully defend themselves against civil actions resulting from the defendants' seeking, in good faith, to prevent a crime in progress or a future crime. Because Schwankl's case satisfies all of the elements of section 16–3–203, we direct the court of appeals to return the case to the trial court to enter an order awarding Schwankl the attorney fees and costs she has incurred in this litigation.

Justice BENDER does not participate.