Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2022 CO 32**

No. 20SC947, *Ford Motor Co. v. Walker*—Personal Injury Judgment Debtor—Interest on Damages—Statutory Interpretation—§ 13-21-101, C.R.S. (2021)—Statutorily Fixed Nine Percent Interest Rate—Market-Based Postjudgment Interest Rate—Appealed Judgment—Final Judgment.

In this product liability case, the supreme court determines that section 13-21-101, C.R.S. (2021) ("Interest on damages"), is ambiguous. Relying on the General Assembly's intent, as reflected in the statute's legislative history, the supreme court holds that when a personal injury judgment debtor successfully appeals the judgment and obtains a new trial but ultimately incurs another money judgment at that new trial, the interest between the date of the appealed judgment and the date the final judgment is satisfied must be calculated using the market-based rate, not the statutorily fixed rate of nine percent.

In so doing, the supreme court clarifies that whenever the judgment debtor appeals the judgment, the interest rate switches from nine percent to the market-based rate. The outcome of the appeal is of no consequence; the filing of any

appeal of the judgment by the judgment debtor triggers the shift in interest rate. This includes a situation where, as here, the judgment debtor appeals the judgment, the judgment is reversed with instructions to hold a new trial, and the judgment debtor incurs a new money judgment at the retrial.

In sum, if the judgment debtor doesn't appeal the judgment, the nine percent interest rate applies from accrual of the claim through satisfaction of the final judgment.  But if the judgment debtor appeals the judgment, then: (1) the nine percent interest rate applies from accrual of the claim through the date of the appealed judgment, and (2) the market-based postjudgment interest rate applies from the date of the appealed judgment through satisfaction of the final judgment.

Because the court of appeals concluded otherwise, the supreme court reverses.  The matter is remanded for recalculation of interest on the sum to be paid.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2022 CO 32

### Supreme Court Case No. 20SC947
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA1243

### Petitioner:

Ford Motor Company,

v.

### Respondent:

Forrest Walker.

### Judgment Reversed
*en banc*
June 21, 2022

**Attorneys for Petitioner:**
Wheeler Trigg O'Donnell LLP
Theresa Wardon Benz
Kristen L. Ferries
Edward C. Stewart
    *Denver, Colorado*

**Attorneys for Respondent:**
Purvis Gray Thomson, LLP
John A. Purvis
Michael J. Thomson
    *Boulder, Colorado*

Chalat Hatten & Banker, PC
Evan P. Banker
    *Denver, Colorado*

**Attorneys for Amicus Curiae American Tort Reform Association:**
Evans Fears & Schuttert LLP
Lee Mickus
    *Denver, Colorado*

**Attorneys for Amici Curiae Colorado Defense Lawyers Association and Colorado Civil Justice League:**
Messner Reeves LLP
Kendra N. Beckwith
Darren D. Alberti
    *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
McDermott Law, LLC
Timothy M. Garvey
    *Denver, Colorado*

Ogborn Mihm, LLP
Kylie M. Schmidt
    *Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT, JUSTICE HOOD,** and **JUSTICE GABRIEL** joined.
**JUSTICE MÁRQUEZ**, joined by **JUSTICE HART**, dissented.
**JUSTICE BERKENKOTTER** did not participate.

2

JUSTICE SAMOUR delivered the Opinion of the Court.

¶1     Watch TV long enough and you'll eventually encounter a well-known figure of our justice system—the personal injury plaintiff. It's now common knowledge that a person who sustains personal injuries as a result of a tort may sue the responsible party for damages. But few people are aware that when such a plaintiff prevails, interest is available on the sum of the judgment. That interest generally runs at the statutorily fixed rate of nine percent from the date of the claim's accrual through satisfaction of the judgment. In some circumstances, however, the interest rate changes to a market-based postjudgment rate, which is currently lower than nine percent. In this appeal, we explore *when* that switch takes place and *how* the market-based postjudgment interest is calculated.

¶2     The plaintiff in this product liability case obtained a money judgment to compensate him for personal injuries he sustained in a car accident. The judgment debtor, the manufacturer of the plaintiff's car, appealed, and a division of the court of appeals reversed the judgment. We affirmed the division's judgment on different grounds and remanded the matter for a new trial. On remand, the plaintiff prevailed again, obtaining a new money judgment. The parties agree that the nine percent interest rate applies from the date of the accident until the date of the appealed judgment (the first judgment). But the parties cross swords on the

applicable interest rate between entry of that judgment and satisfaction of the final judgment (the second judgment).

¶3 So, when a personal injury judgment debtor successfully appeals the judgment and obtains a new trial but ultimately incurs another money judgment at that new trial, which interest rate applies between the date of the appealed judgment and the date the final judgment is satisfied? Is it the nine percent fixed rate or the market-based postjudgment interest rate? The difference matters—in this case, for nearly two million reasons. A division of the court of appeals said that the nine percent fixed rate governs. We disagree and therefore reverse.

¶4 Guided by the General Assembly's intent in section 13-21-101, C.R.S. (2021) ("Interest on damages"), which we discern from the statute's legislative history, we hold that whenever the judgment debtor appeals the judgment, the interest rate switches from nine percent to the market-based rate. The outcome of the appeal is of no consequence; the filing of any appeal of the judgment by the judgment debtor triggers the shift in interest rate. We further hold that the market-based postjudgment interest on the sum to be paid must be calculated from the date of the appealed judgment. Thus, the market-based postjudgment interest rate applies from the date of the appealed judgment (the first judgment) through the date the final judgment (the second judgment) is satisfied. Accordingly, we remand for recalculation of interest on the sum to be paid ($2,929,881.20) from the

4

date of the appealed judgment (April 1, 2013) until the date the final judgment was satisfied (March 10, 2020) using the market-based postjudgment interest rate.

## I. Facts and Procedural History

¶5 In 2009, Forrest Walker was stopped at a red light in his 1998 Ford Explorer when he was rear-ended by a car traveling thirty-five miles per hour. The driver's seat in the Explorer yielded rearward, causing Walker to sustain permanent injuries.

¶6 Walker sued the other driver for negligence. He also brought a product liability action against Ford, alleging that the driver's seat in his Explorer was defective because its yield during the crash caused or contributed to his injuries. Ford denied liability, arguing that the seat's yield was an intentional safety feature aimed at absorbing crash forces. In April 2013, after settling his claim with the other driver, Walker proceeded to trial against Ford.

¶7 At the jury instructions conference, Walker asked for the pattern instruction addressing design defects, which permitted the jury to find a design defect under either a "consumer expectation" test or a "risk-benefit" test. Ford objected, contending that longstanding precedent required the court to use the risk-benefit test. The court overruled Ford's objection and gave the jury the pattern instruction. After deliberations, the jury awarded Walker $2,915,971.20 in compensatory damages. The court then entered judgment.

5

¶8 Ford appealed the 2013 judgment, and a unanimous division of the court of appeals reversed and remanded for a new trial. *Walker v. Ford Motor Co.* ("*Walker I*"), 2015 COA 124, ¶ 3, 410 P.3d 609, 611. While the division disagreed with Ford that the jury could not be "instructed *at all* on the consumer expectation test," it agreed with Ford that the jury shouldn't have been "instructed *separately*" on that test. *Id.* at ¶ 14, 410 P.3d at 613.

¶9 Walker petitioned our court for certiorari, and we agreed to review the case. We affirmed the division's judgment, albeit on different grounds. *Walker v. Ford Motor Co.* ("*Walker II*"), 2017 CO 102, ¶ 2, 406 P.3d 845, 847. We held that "the proper test under which to assess the design's dangerousness was the risk-benefit test, not the consumer expectation test." *Id.* (footnote omitted). In so doing, we explained that we had concluded, more than thirty years earlier, that the risk-benefit test is the applicable test in determining whether a product is unreasonably dangerous due to a design defect where, as here, the dangerousness of the design is defined primarily by technical, scientific information. *Id.* Because the trial court had instructed on both tests, we concluded that it had improperly allowed the jury to base the verdict on the consumer expectation test alone. *Id.*

¶10 The case was retried to a jury in 2019, six years after entry of the appealed judgment and nearly a decade after the crash. The second jury awarded Walker $2,929,881.20 in compensatory damages, $13,910 more than the first jury.

¶11 Walker thereafter requested that the district court award him interest on the final judgment amount at the statutory rate of nine percent for the entire timespan between accrual of his claim in 2009 and satisfaction of the 2019 final judgment in 2020. Ford conceded that it owed interest at the nine percent statutory rate for the period between accrual of Walker's claim in 2009 and entry of the appealed judgment in 2013. But Ford maintained that the lower, market-based postjudgment interest rate applied from entry of the appealed judgment in 2013. In other words, according to Ford, the nine percent interest rate applied from accrual of Walker's claim up until the date of the first judgment, and the market-based postjudgment interest rate applied thereafter for the remainder of the proceedings through satisfaction of the second judgment.

¶12 The district court sided with Walker and ordered Ford to pay $3,629,792.85 in interest, nearly one hundred and twenty-five percent more than the actual damages award, bringing Walker's recovery to just under $7,000,000.00. It reasoned that, since the appealed judgment had neither been affirmed nor modified or reversed with instructions to enter a money judgment on remand, the provisions of section 13-21-101(2)(a) and (b) addressing market-based postjudgment interest did not apply. Apparently realizing that subsections (2)(a) and (b) don't expressly address reversal of an appealed judgment with instructions to hold a retrial, the district court filled the gap by applying the fixed

7

nine percent "prejudgment" interest rate from accrual of the claim through satisfaction of the final judgment (i.e., from 2009 through 2020).

¶13    Ford did not appeal the second judgment, but it did appeal the amount of interest ordered.  A different division of the court of appeals unanimously affirmed. *Walker v. Ford Motor Co.* ("*Walker III*"), 2020 COA 164, ¶ 1, 490 P.3d 996, 997.  The division observed that the switch from "prejudgment to postjudgment interest" doesn't depend on the judgment debtor's appeal of the judgment.  *Id.* at ¶ 8, 480 P.3d at 998.  Rather, explained the division, the shift from the nine percent interest rate to the market-based postjudgment interest rate is outcome-dependent: The latter interest rate kicks in only if the appealed judgment is (1) affirmed or (2) modified or reversed with instructions to enter a money judgment on remand.  *Id.* at ¶ 9, 490 P.3d at 998.  Because the appealed judgment here was reversed and the case was remanded for a new trial, and because subsections (2)(a) and (b) don't expressly address that situation, the division filled the gap the same way the district court did: It ruled that the nine percent "prejudgment interest" continued to apply after the date of the appealed judgment.  *Id.* at ¶ 1, 490 P.3d at 997.

¶14    Elaborating, the division stated that, following the mandate in *Walker II*, the parties returned to their prejudgment posture, with "nothing for postjudgment interest to accrue on while the retrial was pending."  *Id.* at ¶ 9, 490 P.3d at 999.  At

8

that point, reasoned the division, the appealed judgment ceased to exist and the postjudgment proceedings reverted to prejudgment proceedings. *Id.* at ¶ 10, 490 P.3d at 999. And, added the division, whatever postjudgment interest had already accrued before issuance of the mandate vanished along with the appealed judgment, but only until a new judgment entered at the retrial, at which time it reappeared as prejudgment interest. *Id.* at ¶ 11, 490 P.3d at 999.

¶15     Ford timely sought review in our court, and we granted its petition for certiorari. We agreed to consider the following issue:

> Whether the court of appeals erred in applying the nine percent prejudgment interest rate under section 13-21-101, C.R.S. (2021), during the pendency of a successful appeal.

## II.  Analysis

¶16     We begin by discussing the governing standard of review and the relevant rules of statutory interpretation. Using those guardrails to direct our analysis, we examine section 13-21-101 and determine that it is ambiguous. In the process, we reject Walker's contention that the statute is susceptible of only one reasonable interpretation—his. We then conclude that the division erred in dodging the ambiguity question and filling the gap in subsection (2) in a manner that contradicts subsection (1). Because we find that the statute is ambiguous, we next consult its legislative history to discern our General Assembly's intent. Effectuating that intent leads us to hold that the division mistakenly applied the

9

nine percent interest rate, instead of the market-based postjudgment interest rate, between entry of the 2013 appealed judgment and satisfaction of the 2019 final judgment in 2020. We end by demonstrating that the interpretation we usher in today is the only one that effectuates all of section 13-21-101's provisions without contravening any of them.

## A. Governing Standard of Review and Relevant Rules of Statutory Interpretation

¶17 Resolution of this appeal hinges on our interpretation of section 13-21-101. It is paradigmatic that the interpretation of a statute "is a question of law, which we review de novo." *McCulley v. People*, 2020 CO 40, ¶ 10, 463 P.3d 254, 257.

¶18 Our mission when interpreting a statute is to ascertain and effectuate the legislature's intent. *Elder v. Williams*, 2020 CO 88, ¶ 18, 477 P.3d 694, 698. To do so, we read the statute's words and phrases in accordance with their plain and ordinary meaning. *Id.* Additionally, "we look to the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we avoid constructions that would render any words or phrases superfluous or that would lead to illogical or absurd results." *Id.*

¶19 If the statutory language is unambiguous, we apply it as written and go no further. *Nieto v. Clark's Market, Inc.*, 2021 CO 48, ¶ 12, 488 P.3d 1140, 1143. However, if the statutory language is ambiguous—meaning that it is susceptible of more than one reasonable interpretation—"we turn to other interpretive aids to

discern the legislature's intent." *Id.* at ¶ 13, 488 P.3d at 1143. Such interpretive aids include "analysis of the statute's legislative history," *People v. Sprinkle*, 2021 CO 60, ¶ 22, 489 P.3d 1242, 1246, but do not include adding our own words or deleting any the legislature has chosen, *Nieto*, ¶ 12, 488 P.3d at 1143; *see also Dep't of Revenue v. Agilent Techs., Inc.*, 2019 CO 41, ¶ 16, 441 P.3d 1012, 1016 ("[W]e must respect the legislature's choice of language, and we will not add words to a statute or subtract words from it.").

## B. Section 13-21-101

¶20     Section 13-21-101(1) provides that plaintiffs in personal injury cases stemming from a tort may claim interest on the damages alleged "from the date the action accrued." When a plaintiff claims interest, "it is the duty of the court" to add interest on the amount of damages assessed. *Id.* Such interest must be "calculated at the rate of nine percent per annum" up until "the date of satisfying the judgment." *Id.* Further, this calculation "must include compounding of interest annually from the date the suit was filed." *Id.*

¶21     But section 13-21-101 doesn't end there. As relevant here, it contains three additional provisions—a general one in the last sentence of subsection (1) and two more specific ones comprising subsections (2)(a) and (b)—that instruct courts to apply a market-based annual rate of interest, instead of the nine percent annual rate of interest, in certain circumstances:

11

Subsection (1):

[I]f a judgment for money in an action brought to recover damages for personal injuries is *appealed by the judgment debtor*, postjudgment interest must be calculated on the sum at the [market-based rate] from the date of judgment through the date of satisfying the judgment and must include compounding of interest annually.[1]

Subsection (2)(a):

If a judgment for money in an action brought to recover damages for personal injuries is *appealed by a judgment debtor and the judgment is affirmed*, postjudgment interest [at the market-based rate] is payable from the date of judgment through the date of satisfying the judgment.

Section (2)(b):

If a judgment for money in an action to recover damages for personal injuries is *appealed by a judgment debtor and the judgment is modified or reversed with a direction that a judgment for money be entered in the trial court*, postjudgment interest [at the market-based rate] is payable from the date of judgment through the date of satisfying the judgment. This postjudgment interest is payable on the amount of the final judgment.

§ 13-21-101(1)–(2) (emphases added).[2]

¶22    The interplay among this trio of provisions requires us to navigate a jurisprudential Bermuda Triangle—all the while ensuring that none of the

---

[1] For the sake of convenience, we refer to this provision as "subsection (1)."

[2] All three provisions call for calculation of postjudgment interest based on the annual rate set forth in subsections (3) and (4) of the statute. "Subsections (3) and (4) provide a market-based method for calculation of interest." *Sperry v. Field*, 205 P.3d 365, 367 (Colo. 2009).

provisions mysteriously disappear. Of course, the first step in our analysis is to determine whether these provisions are ambiguous.

## C. Is Section 13-21-101 Ambiguous?

¶23 Walker maintains that section 13-21-101 is clear and unambiguous. Ford disagrees. And so do we.

### 1. Section 13-21-101 Is Susceptible of Two Reasonable Interpretations and Is Thus Ambiguous

¶24 At the outset, we note that this court has declared more than once that section 13-21-101 is "not a model of clarity." *Seaward Constr. Co. v. Bradley*, 817 P.2d 971, 975 (Colo. 1991); *Morris v. Goodwin*, 185 P.3d 777, 780 (Colo. 2008). The statute hasn't become any clearer since we last uttered those words.

¶25 Whereas subsections (2)(a) and (b) require application of the market-based postjudgment interest rate following specific outcomes on appeal—affirmance of the judgment and modification or reversal of the judgment with directions to enter a money judgment on remand—subsection (1) applies *whenever* the judgment debtor appeals the judgment. The following question naturally flows from this trifecta of provisions: What happens if, as here, the judgment debtor appeals the judgment, thereby coming within the purview of subsection (1), but the outcome of the appeal is neither the one set forth in subsection (2)(a) (affirmance of the judgment) nor one of those set forth in subsection (2)(b) (modification or reversal of the judgment with directions to enter a money judgment on remand)? What if,

13

as occurred here, the judgment debtor appeals the judgment and obtains a reversal of the judgment *and a new trial*?

¶26 Walker's position, which is subsection (2)-centric, is that the market-based postjudgment interest rate is inapplicable because the outcome of Ford's appeal was neither affirmance of the judgment nor the judgment's modification or reversal with directions to enter a money judgment on remand. Ford pushes back and redirects our attention to subsection (1), arguing that the market-based postjudgment interest rate applies whenever the judgment debtor appeals the judgment, regardless of the outcome of the appeal. Walker then counters that subsection (1) cannot be construed as Ford proposes because requiring application of the market-based postjudgment interest rate whenever the judgment debtor appeals the judgment would render the outcome-specific provisions in subsections (2)(a) and (b) superfluous.

¶27 But subsection (1) says what it says: The trial court must apply the market-based postjudgment interest rate "if a judgment for money in an action brought to recover damages for personal injuries is appealed by the judgment debtor." Subsection (1) isn't tethered to the outcome of the appeal. It plainly requires applying the market-based postjudgment interest rate whenever the judgment debtor appeals the judgment.

¶28    No matter, says Walker; that can't be what the legislature meant. If the legislature had intended for the market-based postjudgment interest rate to apply whenever the judgment debtor appeals the judgment, asks Walker, why did it include the two outcome-specific provisions in subsection (2)?

¶29    According to Walker, subsections (2)(a) and (b) present the two "specific and clearly defined situations" in which the interest rate shifts. In this regard, Walker invokes the *expressio unius est exclusio alterius* canon[3] and invites us to interpret the inclusion of the two specific scenarios in subsections (2)(a) and (b) as excluding all others not specified. As Walker puts it, section 13-21-101 should be read as sanctioning two, and only two, exceptions to the nine percent interest rate—those set forth in subsections (2)(a) and (b). In the event the judgment debtor appeals the judgment, obtains a reversal and a new trial, and incurs another money judgment on retrial, as happened here, Walker would have the judgment debtor go back to square one: The trial court on remand would add nine percent interest from the date of the action's accrual until the date the final judgment is

---

[3] *Expressio unius est exclusio alterius* is a canon of construction that holds that when one thing is expressed or included, it "implies the exclusion of the other, or of the alternative." *Expressio Unius Est Exclusio Alterius*, Black's Law Dictionary (11th ed. 2019).

satisfied. Thus, asserts Walker, when section 13-21-101 is considered as a whole, it is unambiguous, internally harmonious, and complete.

¶30 But try as Walker might, he cannot get around subsection (1)'s command to apply the market-based postjudgment interest rate "[i]f a judgment for money . . . is appealed by the judgment debtor." We're not permitted to disregard the plain and ordinary meaning of these words, much less speculate that they mean something completely different. *See Elder*, ¶ 18, 477 P.3d at 698.

¶31 Moreover, while Walker urges us to reject Ford's interpretation in order to avoid rendering subsections (2)(a) and (b) superfluous, Ford asks us to accept its interpretation in order to avoid doing the same to subsection (1). And Ford asks the inverse of Walker's question: If the legislature intended for the market-based postjudgment interest rate to apply only in the two situations specified in subsections (2)(a) and (b), why did it include the general directive in subsection (1) calling for the market-based postjudgment interest rate to apply whenever the judgment is "appealed by the judgment debtor"?

¶32 To our mind, contrary to Walker's claim, section 13-21-101 is susceptible of two reasonable interpretations.

¶33 On the one hand, it is reasonable to read section 13-21-101 as Walker does: The market-based postjudgment interest rate applies only in the outcome-specific situations identified in subsections (2)(a) and (b). This is the interpretation the

16

division embraced. The division stated that section 13-21-101 would require application of the market-based postjudgment interest rate to every appeal of the judgment by the judgment debtor only if subsection (1) were "considered in isolation." *Walker III*, ¶ 8, 490 P.3d at 998. But, explained the division, when that provision is considered together with subsections (2)(a) and (b), "it becomes clear" that whether "prejudgment or postjudgment interest" applies depends on the outcome of the appeal. *Id.*

¶34 On the other hand, it is reasonable to read section 13-21-101 as Ford does: The market-based postjudgment interest rate applies whenever the judgment is appealed by the judgment debtor. Under this interpretation, subsection (1) is effectuated without canceling out subsections (2)(a) and (b); subsections (2)(a) and (b) are simply treated as enumerated but inexhaustive examples of the situations governed by the broader subsection (1).

¶35 Given these different interpretations, both of which are reasonable, we conclude that section 13-21-101 is ambiguous and that the plain-meaning rule cannot decode the statute's legislative intent. We are not persuaded otherwise by

Walker's contention that we are restricted to the plain language of the statute because, in his view, his interpretation is the only reasonable one.[4]

## 2. Ford's Interpretation of Section 13-21-101 Is at Least as Reasonable as Walker's

¶36    Walker insists that Ford's interpretation is unreasonable and thus cannot render section 13-21-101 ambiguous.  According to Walker, the market-based postjudgment interest rate cannot be applied from the date of the judgment Ford appealed in 2013 because that judgment never became a final judgment (or "a judgment that is to be paid").  While the parties both believe that the market-based postjudgment interest rate generally applies from the date the appealed judgment enters, Walker adds a condition—only if the appealed judgment eventually becomes the final judgment.  In this regard, Walker argues that only an appealed judgment that eventually becomes the final judgment can serve as a "dividing line" between "prejudgment interest" and "postjudgment interest" and thus activate the shift from the nine percent rate to the market-based rate.[5]

---

[4] For Walker to be right, not only must his interpretation of section 13-21-101 be reasonable, Ford's interpretation must also be unreasonable.  *See Magana v. People*, 2022 CO 25, ¶ 27, __ P.3d __ (noting that an interpretation that's unreasonable cannot render a statute ambiguous).

[5] Walker seeks nine percent interest through *satisfaction* of the final judgment in 2020, not through *entry* of the final judgment in 2019, explaining that Ford did not

18

¶37     Before proceeding to discuss the merits of Walker's position, we pause to address his prejudgment/postjudgment "dividing line" hypothesis. Part of the confusion in this area of the law lies in the perception that section 13-21-101 creates a perfect dichotomy between "prejudgment interest" and "postjudgment interest." Attorneys and judges may do well to stop thinking about the statute as establishing a fork in the road that leads to either "prejudgment interest" or "postjudgment interest." The word "prejudgment" is nowhere to be found in section 13-21-101. And when the judgment debtor doesn't appeal the judgment, the nine percent interest rate applies beyond the date of the judgment—until the judgment is satisfied—including during any postjudgment proceedings held by the trial court. In other words, absent an appeal of the judgment, the nine percent interest rate applies both prejudgment and postjudgment; it doesn't stop applying when the judgment enters. Hence, it is not accurate to characterize the nine percent interest rate as the "prejudgment" interest rate.

¶38     True, section 13-21-101 contains multiple references to "postjudgment interest" to describe the interest that applies during *certain* postjudgment proceedings. For that matter, so does our opinion; doing our best to track the

appeal that judgment and, thus, the market-based postjudgment interest rate never kicked in.

19

statute, we refer to "postjudgment interest." But the statute doesn't extend its postjudgment interest provisions to *all* postjudgment proceedings. Indeed, as we just mentioned, if there is no appeal, the postjudgment provisions have no application at all, even if the trial court holds postjudgment proceedings.

¶39 The distinction section 13-21-101 actually draws is between the judgment debtor appealing the judgment and the judgment debtor not appealing the judgment. *Cf. Rodriguez v. Schutt*, 914 P.2d 921, 928 (Colo. 1996) (explaining that the 1982 amendment to section 13-21-101, which implemented the triumvirate of provisions before us, "created the distinction between judgments which the judgment debtor appeals and those which the judgment debtor does not appeal"). Whether to continue to apply the nine percent interest rate or switch to the market-based interest rate is anchored to that line of demarcation, not to the prejudgment/postjudgment distinction Walker makes. We therefore avoid viewing the statute as creating a binary choice between prejudgment and postjudgment interest.

¶40 With that understanding, we return to the merits of Walker's position. He contends that his is the sole reasonable statutory construction because, under the plain language of section 13-21-101, an appealed judgment cannot precipitate the change in interest rate unless that judgment eventually becomes the judgment that is to be paid (i.e., the final judgment). But the statute isn't so clear. In fact, it can

20

be read as directly undercutting Walker's position and reinforcing Ford's. To illustrate the point, we find it helpful to dissect subsection (1):

> *[I]f a judgment for money in an action brought to recover damages for personal injuries is appealed by the judgment debtor, postjudgment interest must be calculated* on the sum at the [market-based rate] from the date of judgment through the date of satisfying the judgment and must include compounding of interest annually.[6]

¶41 The italicized language above (in electric green) spells out *when* the market-based postjudgment interest rate replaces the nine percent interest rate: "[I]f a judgment for money in an action brought to recover damages for personal injuries is appealed by the judgment debtor, postjudgment interest must be calculated." Stated differently, the nine percent interest rate applies starting with accrual of the claim, but if the judgment debtor appeals the judgment, the market-based postjudgment interest rate kicks in, regardless of whether the appealed judgment is eventually upheld and becomes the final judgment "that is to be paid" or if a different money judgment eventually enters.[7] Once the court has resolved that the market-based postjudgment interest rate applies because the judgment debtor

---

[6] Subsections (2)(a) and (b) contain similar language that may be dissected in comparable fashion.

[7] It hardly bears stating that our analysis is relevant only if there is ultimately a money judgment against the judgment debtor. If there is no money judgment, there is necessarily no interest.

21

appealed the judgment (i.e., the *when* inquiry), the underlined language above (in aqua blue) tells us *how* to calculate such interest: (i) "on the sum," (ii) at the market-based rate, (iii) "from the date of judgment through the date of satisfying the judgment," and (iv) including "compounding of interest annually."

¶42    We focus on part (iii) of the *how* inquiry—the period during which the market-based postjudgment interest must be calculated ("from the date of judgment through the date of satisfying the judgment").  There is no real disagreement over the meaning of parts (i), (ii), and (iv) of the *how* inquiry—the "sum" on which the market-based postjudgment interest is to be calculated, the market-based rate, and the annual compounding of interest, respectively.[8]

¶43    The phrase "from the date of judgment through the date of satisfying the judgment," which also appears in subsections (2)(a) and (b), sets the starting line ("the date of judgment") and the finish line ("the date of satisfying the judgment")

---

[8] Contrary to Walker's suggestion, the "sum" is relevant to the *how*, not the *when*, inquiry in subsection (1)—i.e., it goes to *how* to calculate the market-based postjudgment interest, not to *when* such interest applies.  Nevertheless, we agree with Walker that "sum" necessarily refers to the amount of the judgment to be paid.  Any interest must logically be calculated on the amount of the final judgment. Subsection (2)(b) buttresses this conclusion.  That subsection specifies that when the judgment debtor appeals a judgment and the judgment is modified or reversed with directions that a money judgment enter on remand, the market-based interest is payable "on the amount of the final judgment."

for any market-based postjudgment interest calculation. Ascertaining the finish line is a walk in the park; after all, "the date of satisfying the judgment" is always the date the judgment debtor pays off the judgment. But ascertaining the starting line is not so easy. The question is: What did the legislature mean by "judgment" in "the date of judgment"? More to the point, is Walker right that the legislature meant to require market-based postjudgment interest only if an appealed judgment eventually becomes the final judgment?[9] In a word, no.

¶44 If there is only one judgment because there was an affirmance on appeal, *see* § 13-21-101(2)(a), there is obviously only one option: The market-based postjudgment interest rate applies "from the date of [the only] judgment," which is *the date of the appealed judgment that eventually became the final judgment*. Neither side picks a bone with this conclusion. It gets trickier, though, if the judgment debtor appeals the judgment and the judgment is modified or reversed with instructions to enter a money judgment on remand, à la subsection (2)(b).

¶45 Walker acknowledges that subsection (2)(b) requires applying the market-based postjudgment interest rate from the date of the appealed judgment. But

---

[9] As he does with the word "sum," Walker mistakenly implies that "the date of judgment" is relevant to determine *when* the market-based postjudgment interest applies, as opposed to *how* to calculate such interest when it applies.

how does that jibe with Walker's theory that only an appealed judgment that eventually becomes the final judgment can trigger the switch in interest rates? After all, under subsection (2)(b), the appealed judgment is modified or reversed with instructions to enter a new money judgment on remand. As we show next, subsection (2)(b) proves to be a fly in the ointment for Walker.

¶46 Per Walker, just as in subsection (2)(a), in subsection (2)(b), an appealed judgment always becomes the final judgment—it's just that the judgment debtor may simply be required to pay the appealed judgment "in part." But Walker goes too far. Under subsection (2)(b), the appealed judgment doesn't become the final judgment because the appealed judgment is *modified* or *reversed* with instructions for the trial court to enter a new money judgment on remand. The final judgment entered in this situation is necessarily different from the appealed judgment: The final judgment is either a modified version of the appealed judgment or, in the event of a reversal, a completely new judgment. That's not the same thing as paying the appealed judgment "in part." Even assuming for the sake of argument that a modified money judgment could be deemed to be the same judgment as the appealed judgment, how can a new money judgment be deemed to be the same judgment as the appealed judgment after the appealed judgment has been *reversed*? Given subsection (2)(b), Walker can't be right in asserting that only an appealed judgment that eventually becomes the final judgment may trigger the

24

switch from the nine percent interest rate to the market-based postjudgment interest rate.

¶47 In any event, Walker's hypothesis hits another insurmountable snag when, as here, a judgment is reversed and a new trial is ordered.[10] In such a scenario, says Walker, there is no judgment on which to apply the market-based postjudgment interest rate, and thus, if a new money judgment enters following the remand trial and that second judgment is not appealed, the "prejudgment" nine percent interest rate continues to apply after entry of the appealed judgment (the first judgment) up until satisfaction of the final judgment (the second judgment).

¶48 However, Walker provides no persuasive justification for his disparate treatment of a situation in which a judgment is reversed with instructions to enter a new money judgment on remand (subsection (2)(b)) and a situation in which a judgment is reversed with instructions for a new trial and the retrial results in a new money judgment (this case). A reversed judgment is a reversed judgment,

---

[10] Walker attempts to distance this case from subsection (2)(b) by referring to the appealed judgment as a judgment that was "vacated," not "reversed." For our purposes, we perceive no substantive difference between a vacated judgment and a reversed judgment. Regardless, the appealed judgment in this case was reversed, not vacated.

25

regardless of whether, as in subsection (2)(b), it is accompanied by instructions to enter a new money judgment on remand or, as here, it is accompanied by instructions to hold a new trial on remand. In both scenarios, the judgment is reversed.

¶49 Even more concerning, Walker offers no compelling explanation as to why the judgment debtor who fully succeeds on appeal (by obtaining a reversal of the judgment and a new trial) should pay the nine percent interest rate during the pendency of the appeal while the judgment debtor who is only partially successful on appeal (by obtaining a reversal of the judgment with instructions to enter a new money judgment on remand) should pay the lower market-based interest rate during the same timeframe. Differently put, Walker doesn't effectively address why the judgment debtor who fully succeeds on appeal should be worse off (at least when the market-based interest rate is below the nine percent rate) than the judgment debtor who only partially succeeds on appeal. The legislature could not have intended such an absurd result. Thus, even if Walker were right about the plain language of the statute, we would still "look to the legislature's intent" to ward off this absurd result. *See Cisneros v. Elder*, 2022 CO 13M, ¶ 28, 506 P.3d 828, 833; *accord AviComm, Inc. v. Colo. Pub. Utils. Comm'n*, 955 P.2d 1023, 1031 (Colo. 1998) (indicating that "the intention of the legislature will prevail over a literal interpretation of the statute that leads to an absurd result").

26

¶50    In our view, a different interpretation of "the date of judgment"—one that's as reasonable as, if not more reasonable than, the one Walker advances—is that *it always means the date of the appealed judgment, regardless of whether the appealed judgment eventually becomes the final judgment or the judgment to be paid.* As we just explained, subsection (1) calls for the switch between the nine percent interest rate and the market-based postjudgment interest rate *when* the judgment debtor appeals the judgment. Consequently, a way to construe the *how* portion of subsection (1) so as to be congruous with the *when* portion is to understand "the date of judgment" as the date of the appealed judgment.

¶51    The phrase "from the date of judgment through the date of satisfying the judgment" in the three provisions under scrutiny can thus reasonably be understood as requiring calculation of postjudgment interest *from the date of the appealed judgment through the date of satisfying the final judgment*—be that satisfied final judgment the same judgment as the appealed judgment (in the event of an affirmance of the appealed judgment) or a different judgment from the appealed judgment (in the event of a modification of the appealed judgment or a reversal of the appealed judgment—with or without a retrial).[11] Putting it all together, then,

_____

[11] We realize that this construction gives two different meanings to the word "judgment" in the phrase "from the date of judgment through the date of satisfying the judgment"—with the first "judgment" referring to the appealed

27

section 13-21-101 can reasonably be read as Ford reads it: Postjudgment interest applies whenever the judgment debtor appeals the judgment, including when the judgment is affirmed, modified, or reversed with instructions to enter a new money judgment, as well as when the judgment is reversed with instructions to hold a new trial (the *when* inquiry); and if postjudgment interest applies, it must be calculated on the amount to be paid at the market-based rate from the date of the appealed judgment through the date of satisfaction of the final judgment (the *how* inquiry).

¶52 Walker nevertheless protests that where, as here, a judgment has been reversed and a new judgment has entered at the retrial, the legislature could not have intended to require application of the market-based postjudgment interest rate from the date of the appealed judgment because that judgment ceased to exist the moment it was reversed. But subsection (2)(b) belies Walker's surmise regarding the legislature's intent. In some subsection (2)(b) situations, there is no judgment on which to grant postjudgment interest either. For example, when the

judgment and the second "judgment" referring to the final judgment. But subsection (2)(b) reflects that this is what the legislature intended. Under subsection (2)(b), the appealed judgment can never be the same judgment as the final judgment that's eventually satisfied because the appealed judgment is modified or reversed and a different money judgment enters.

judgment debtor's appeal results in the judgment being reversed and a new money judgment entering on remand pursuant to an appellate court's instructions, the appealed judgment ceases to exist upon issuance of the mandate. Yet neither party contests that, pursuant to subsection (2)(b), postjudgment interest accrues between the date of the mandate and the date of the final judgment on remand. In fact, the parties agree that, under subsection (2)(b), postjudgment interest accrues between the date of the appealed judgment and the date of the final judgment's satisfaction, even though the appealed judgment is reversed.

¶53 If the legislature intended to apply the market-based postjudgment interest rate in the absence of a judgment in some subsection (2)(b) situations, why couldn't it have had the same intent in the situation we face here? We are aware of no authority, and Walker has unearthed none, that stands for the proposition that, unlike an appellate court's remand for entry of a new judgment, an appellate court's remand for a retrial bars postjudgment interest because it turns back the clock and transforms the proceedings and any interest from "postjudgment" to "prejudgment." We are equally unaware of any authority that allows vanished postjudgment interest to reappear as prejudgment interest.

¶54 Walker's position is inherently flawed. He sees section 13-21-101 through the prejudgment/postjudgment prism we cautioned against earlier. According to Walker, our mandate in *Walker II* returned the parties to a *prejudgment* posture and

29

thus only the statute's "prejudgment" interest provisions could apply at that point; the statute's "postjudgment" provisions became inapposite then, he says, because there was no *judgment* on which to accrue *postjudgment* interest. This was the linchpin—and, as it turns out, the hamartia—of the division's decision.

¶55 Viewed through a different lens, market-based postjudgment interest could more reasonably be understood as Ford submits: interest that applies during those postjudgment proceedings identified in the statute—i.e., following the judgment debtor's appeal of the judgment, regardless of whether the appeal results in affirmance of the judgment or in the judgment's modification or reversal, and regardless of whether there is a retrial. Even if the appealed judgment is ultimately reversed and thus null and void, and even if there is a retrial that yields a new money judgment, the interest that accrues between the appealed judgment and satisfaction of the final judgment could still fit within the "postjudgment interest" provisions of the statute. That is to say, if we deem the "judgment" in "postjudgment" to be the appealed judgment—and we already demonstrated that it is sensible to use the appealed judgment as the benchmark to start running market-based postjudgment interest—all of the proceedings that follow that judgment, including on remand, can reasonably be considered "postjudgment."

¶56 That American jurisprudence generally treats reversed judgments as null and void is of no consequence. First, any such case law was clearly not an obstacle

for our legislature's promulgation of subsection (2)(b), which requires market-based postjudgment interest in some situations in which the appealed judgment is reversed and thus null and void. And second, the cases on which Walker relies arose in inapposite contexts. Not one of those cases supports the idea that the date of an appealed judgment cannot serve as the switch between a fixed rate and a market-based rate in calculating interest on a damages award.

¶57 Certainly, neither party questions the legislature's authority to require interest on a judgment long before the judgment ever sees the light of day — recall that nine percent interest starts running from accrual of a claim. Does the legislature lack the power to do the same with market-based postjudgment interest simply because of the "postjudgment" nomenclature? Any concern grounded in the fact that "postjudgment" means "after judgment" evaporates when "judgment" is understood as the appealed judgment (the first judgment). And we've illustrated that such an interpretation is reasonable.

¶58 In short, we are convinced that section 13-21-101 is susceptible of different reasonable interpretations. It is thus ambiguous.

¶59 The division didn't wade into this fray. Instead, it circumvented the ambiguity question altogether.

### 3. The Division Erred in Skirting the Ambiguity Question and Filling the Gap in Subsection (2) in a Manner That Contradicts Subsection (1)

¶60 The first step in interpreting a statute is to make a call on whether its language is ambiguous. The division did not determine whether section 13-21-101 was ambiguous. Instead, it sidestepped the question by simply ruling that the district court's interpretation was consistent with the statute's plain language. *Walker III*, ¶ 13, 490 P.3d at 999. But, as we have shown, Ford's interpretation is likewise consistent with the statute's plain language.

¶61 The division exacerbated its error by filling the gap in subsection (2) in a manner that directly contradicts subsection (1). It used the legislature's silence in subsection (2)—regarding what happens when the judgment appealed by the judgment debtor is reversed and the case is remanded for a new trial—to infer the opposite of what subsection (1) says. Whereas subsection (1) expressly requires application of the market-based postjudgment interest rate whenever the judgment debtor appeals the judgment, the division held that when the judgment debtor appeals the judgment and the judgment is reversed with instructions to hold a new trial on remand, the nine percent interest rate continues to apply.[12]

---

[12] The American Tort Reform Association's amicus brief relies on the gap in subsection (2) to posit that no interest accumulates at all "during the period of an

¶62 Significantly, the division declined to delve further into whether its interpretation of section 13-21-101's plain language was consistent with the legislature's intent because it was afraid of repeating history. *Id.* But that concern, while no doubt well-intentioned, was misguided.

¶63 Leaning on then-Justice Eid's concurrence in *Sperry v. Field*, 205 P.3d 365 (Colo. 2009), the division explained that "[j]udicial attempts to construe section 13-21-101 in a manner that aligns with perceived legislative intent have, in the past, created more problems than they have solved." *Walker III*, ¶ 13, 490 P.3d at 999 (citing *Sperry*, 205 P.3d at 370–71 (Eid, J., concurring in the judgment)). What has proven problematic in the past, however, hasn't been our attempts to ascertain and effectuate the legislative intent in section 13-21-101; it's been our *rewriting* of the statute on two separate occasions—once in *Rodriguez*, 914 P.2d at 927–29, to cure a constitutional infirmity, and once in *Sperry*, 205 P.3d at 369–70, to cure an ambiguity that our redrafting in *Rodriguez* inadvertently created. Hence, the division misapprehended Justice Eid's concurrence in *Sperry*. *See Sperry*, 205 P.3d at 370 (Eid, J., concurring in the judgment) (characterizing our "redrafting effort" in *Rodriguez* as "less than successful," criticizing the majority's decision to

---

appeal that results in a vacated judgment." Neither party has offered this radical construction, and we see no basis for it.

33

"redraft[] even more of the statutory language," and expressing a preference for avoiding additional "'interpretive' efforts . . . that further redraft the statutory language").

¶64 We undertake no rewriting of section 13-21-101 here. Instead, because we conclude that the statute is ambiguous, we turn to its legislative history to discern the General Assembly's intent.

## D. Relevant Legislative History

¶65 We have previously peered beneath the textual façade of section 13-21-101 to glean the legislature's intent in requiring application of the market-based postjudgment interest rate in certain circumstances. More than a quarter of a century ago, we observed that the statute's 1982 amendment reflected the General Assembly's intent to apply the market-based postjudgment interest "only to judgments which the judgment debtor appeals." *Rodriguez*, 914 P.2d at 928; *see also Ackerman v. Power Equip. Co.*, 881 P.2d 451, 452 (Colo. App. 1994) ("In 1982, the General Assembly amended § 13-21-101 to apply a variable market rate of interest if the judgment is appealed by the judgment debtor."). And we inferred dual purposes animating this amendment: "to eliminate the financial incentive (or disincentive) to appeal and to ensure that the judgment creditor whose satisfaction is delayed due to an unsuccessful appeal receives the time value of his or her money judgment." *Rodriguez*, 914 P.2d at 929. The statements of the bill sponsors,

we said, revealed the legislature's desire "to neutralize the economic benefits and detriments of appeal under the statutorily-set rate of interest." *Id.* at 928.

¶66 In 2009, we echoed the comments we made in *Rodriguez*. We stated in *Sperry* that the overall purposes of the personal injury interest statute were "to eliminate any financial incentive or disincentive to appeal and to ensure that the judgment creditor receives the time value of his or her money judgment." 205 P.3d at 370.

¶67 Because the statute's legislative history reveals the General Assembly's intent, we are dutybound to give that intent effect. We do so now.

## E. Effectuating the Legislative Intent in Section 13-21-101

¶68 The only way for us to effectuate the purposes of the three provisions under the microscope is to apply postjudgment interest whenever the judgment debtor appeals the judgment and to calculate that interest using the market-based rate from the date of the appealed judgment until the date of the final judgment's satisfaction. Hence, in a situation like the one here—where the judgment debtor appeals the judgment, obtains a reversal and a new trial, and incurs a new money judgment at the retrial—postjudgment interest must be calculated using the market-based rate from the date of the appealed judgment until the date of the final judgment's satisfaction. No other interpretation neutralizes the economic benefits and detriments of an appeal.

¶69 Applying the fixed statutory rate during the judgment debtor's appeal of the judgment would provide judgment debtors an incentive to appeal whenever the market rate is higher than the fixed rate. In that situation, judgment debtors could capitalize on the difference in the two interest rates because of the potential to continue to earn the higher market rate on the judgment while appealing. By doing nothing more than filing a notice of appeal, and without regard for the merits of the appeal, judgment debtors could enjoy the higher market return on the value of the judgment while paying the lower fixed rate to the judgment creditor if the judgment is eventually affirmed. Talk about an incentive to file an appeal, including a frivolous one.

¶70 Of course, on the flip side, whenever the market rate is lower than the fixed statutory rate, judgment debtors would be dissuaded from pursuing an appeal. Filing an appeal when the fixed statutory rate is higher than the market rate would cause judgment debtors to rack up interest over and above what they could earn in the market during the pendency of the appeal. Talk about a disincentive to file an appeal, including a meritorious one.

¶71 These incentives and disincentives are out of whack and are precisely what the legislature sought to eliminate by requiring a market-based postjudgment interest rate whenever the judgment is "appealed by the judgment debtor." By switching from the fixed interest rate of nine percent to the market-based

postjudgment interest rate whenever the judgment debtor appeals the judgment, the legislature ensured both that the successful plaintiff would be fairly compensated for the time value of the judgment[13] and that any incentive or disincentive to appeal would be neutralized.

¶72     Relatedly, application of the market-based postjudgment interest whenever the judgment debtor appeals the judgment compels the conclusion that "the date of judgment" starting line for calculating such interest is the date of the appealed judgment. Otherwise, it would defeat the purpose of applying the market-based postjudgment interest whenever the judgment debtor appeals the judgment.

¶73     Suppose that the judgment debtor appeals the judgment and the judgment is reversed with instructions for a new trial. Suppose further that a new judgment enters at the retrial. If the market-based postjudgment interest were calculated from the time of the final judgment, it would render subsection (1) and its compatriot provisions as useful as an ashtray on a motorbike. The undesirable

---

[13] The market-based interest rate, which is two percentage points above the discount rate, *see* § 13-21-101(3), compensates the successful plaintiff for the time value of the judgment; indeed, the "time value" of the judgment is determined by the market rate. Walker's argument to the contrary ignores that, even under today's interpretation, he will be entitled to: nine percent interest (eight points above the discount rate) from the date of the accident in 2009 until entry of the appealed judgment in 2013, and market-based postjudgment interest thereafter.

37

incentives and disincentives discussed above would remain. What would be the point of applying the market-based rate after the appeal and retrial have been completed? And in a subsection (2)(b) situation involving a reversal, what would be the point of applying the market-based rate between the date of the new money judgment and the date that judgment is satisfied? Limiting application of the market-based rate to such small windows would turn subsections (1) and (2)(b) into negligible provisions.

¶74    Walker nevertheless claims that using the market-based postjudgment interest rate only serves as a neutralizer for the judgment debtor's decision to appeal if the judgment debtor ultimately ends up owing the judgment creditor money. Sure. But this is a red herring. At the time the decision to appeal is made, the judgment debtor has no way of forecasting the final outcome of the case. Nor would it be fair to expect the judgment debtor to gaze into a crystal ball before deciding whether to appeal the judgment.

¶75    This case illustrates the point. Ford appealed the judgment, not because it channeled its inner Nostradamus and prognosticated that it would owe Walker no money in the end, but because it was convinced that the trial court's jury instructions, which were given at Walker's request, deprived it of a fair trial. As it turned out, Ford was spot-on. And imposing an additional five years of nine percent interest to reward Ford for taking a meritorious appeal and winning it

would be the most pyrrhic of victories. Had Ford known that a fixed, above-market interest rate would apply until satisfaction of any new money judgment at the retrial, it would have been financially disincentivized to appeal the judgment. The risk of having a nine percent interest rate throughout the pendency of this case (more than a decade) may have scared Ford off from pursuing its meritorious appeal.

¶76 Not only would Walker's proposed application of the nine percent interest rate affect the rights of judgment debtors, it would also impact the development of the law. If judgment debtors were dissuaded from pursuing meritorious appeals of trial errors, those errors would never be corrected and would likely be repeated. In the case at hand, the trial court's error on an issue of law—how to properly instruct juries in design defect cases—would have gone uncorrected, as neither *Walker I* nor *Walker II* would have been penned. The public has an interest in the "development of decisional law." *Austin v. Ford*, 181 F.R.D. 283, 285 (S.D.N.Y. 1998).

¶77 To recap, because section 13-21-101 is ambiguous, we rely on the statute's legislative history to discern the General Assembly's intent. Guided by such intent, we hold that whenever the judgment debtor appeals the judgment, the interest rate switches from nine percent to the market-based rate. The outcome of the appeal is of no consequence; the filing of any appeal of the judgment by the

judgment debtor triggers the shift in interest rate. We further hold that the market-based postjudgment interest on the sum to be paid must be calculated from the date of the appealed judgment. Thus, the market-based postjudgment interest rate applies from the date of the appealed judgment through the date the final judgment is satisfied.

¶78 The chart below reflects our understanding of section 13-21-101. We hope that this illustration will be of some assistance moving forward.

**Interest on Damages in Personal Injury Cases Stemming From a Tort**

**The judgment debtor does not appeal the judgment**



Interest is calculated on the sum to be paid at the rate of nine percent per annum from the date the action accrued through the date of satisfying the final judgment. (The calculation must include compounding of interest annually from the date the suit was filed.)

**The judgment debtor appeals the judgment**



Interest is calculated on the sum to be paid at the rate of nine percent per annum from the date the action accrued through the date of the appealed judgment. (The calculation must include compounding of interest annually from the date the suit was filed.)

Interest is calculated on the sum to be paid at the market-based postjudgment rate from the date of the appealed judgment through the date of satisfying the final judgment. (The calculation must include compounding of interest annually.)

## F. The Interpretation We Adopt Today Is the Only One That Effectuates All the Provisions in Section 13-21-101 Without Contradicting Any of Them

¶79 Our holding that the market-based postjudgment interest rate kicks in whenever the judgment debtor appeals the judgment reflects our view that subsection (1) establishes a general rule and subsections (2)(a) and (b) set forth specific instances or examples of that rule's application. This reading of section 13-21-101 admittedly leads to some redundancy. But redundancy isn't a "silver bullet" in the realm of statutory construction. *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019). As the Supreme Court recently explained in *Rimini Street*:

> If one possible interpretation of a statute would cause some redundancy and another interpretation would avoid redundancy, that difference in the two interpretations can supply a clue as to the better interpretation of a statute. But only a clue. Sometimes the better overall reading of the statute contains some redundancy.

*Id.*; *see also White v. United Airlines, Inc.*, 987 F.3d 616, 622 (7th Cir. 2021) (noting that the presence of some redundancy "is rarely fatal on its own to a statutory reading").

¶80 Of course, we are not asked to choose between an interpretation that carries some redundancy and an interpretation that avoids redundancy altogether. The choice we face in the unique situation before us is between interpretations that both create some redundancy. However, the one Walker backs would effectuate

42

subsection (2) while downright contradicting subsection (1), even though they don't pose an either-or proposition.

¶81 We cannot read section 13-21-101 as Walker urges and still give effect to all three provisions. His reading of the statute would force us to choose subsections (2)(a) and (b) over subsection (1). That's because construing subsections (2)(a) and (b) as he does necessarily means contravening subsection (1). Put differently, it is impossible to conclude that the *only* situations in which the market-based postjudgment interest rate applies are those set forth in subsections (2)(a) and (b), while simultaneously effectuating subsection (1)'s command to apply such a rate whenever the judgment debtor appeals the judgment.

¶82 Faced with these two possible paths, the one that gives effect to all three provisions and doesn't contravene any of them is clearly preferable. Whether the legislature included the examples in subsections (2)(a) and (b) as a way to provide clarity or emphasis or for some other reason is neither here nor there. What's important for our purposes is that we give effect to all the provisions in section 13-21-101 without contravening any of them. And, critically, for the reasons we've set out at length, this is the only statutory construction that's faithful to the legislative intent.

## III. Conclusion

¶83    For the foregoing reasons, we reverse the judgment of the division. We conclude that the market-based postjudgment interest rate controls during the period between entry of the appealed judgment and satisfaction of the final judgment. We thus remand for recalculation of interest on the sum to be paid ($2,929,881.20) from the date of the appealed judgment (April 1, 2013) through the date the final judgment was satisfied (March 10, 2020) using the market-based postjudgment interest rate.

**JUSTICE MÁRQUEZ**, joined by **JUSTICE HART**, dissented.

JUSTICE MÁRQUEZ, joined by JUSTICE HART, dissenting.

¶84 The text of section 13-21-101(1) is unambiguous as applied to the facts of this case. Under that provision, Walker, as a successful tort plaintiff, is entitled to statutory nine percent interest on the damages assessed by the jury, compounded annually, "calculated from the date the suit was filed to the date of satisfying the judgment." § 13-21-101(1), C.R.S. (2021). The wrinkle here is, "Which judgment?" Walker obtained a judgment against Petitioner Ford Motor Company in 2013, but Ford won reversal of that judgment on appeal and the case was remanded for a new trial. Following a second trial in 2019, Walker again prevailed and obtained a slightly higher judgment against Ford. So, which judgment? The answer is simple. Because the 2013 judgment was reversed and the case was remanded for a new trial, the judgment that was entered was nullified; it ceased to exist. The only legally valid judgment in this litigation to which any interest can attach is the judgment that entered in 2019. Accordingly, under a straightforward application of section 13-21-101(1), the district court properly awarded statutory nine percent interest, compounded annually, to Walker from the date that he filed suit through the date that it entered judgment in 2019 following the jury's verdict. Such a result comports with this court's repeated recognition that "the legislative purpose behind awarding interest under section 13-21-101 is to compensate the [successful

1

tort] plaintiff for the time value of his or her judgment." *Morris v. Goodwin*, 185 P.3d 777, 780 (Colo. 2008).

¶85 Rather than apply the statute as written, the majority rewrites the last sentence of section 13-21-101(1) to reach a policy result it surmises reflects legislative intent. Although it acknowledges that we do not add words to statutes, maj. op. ¶ 19, and claims that it "undertake[s] no rewriting of section 13-21-101 here," *id.* at ¶ 64, the majority proceeds to do just that. Focusing on language addressing the calculation of *post*judgment interest when a judgment is appealed, the majority treats the legislature's use of the same word—"judgment"— to mean two different things in the same sentence. Specifically, it rewrites the phrase "from the date of judgment through the date of satisfying the judgment," § 13-21-101(1), to instead say, "from the date of [the appealed] judgment through the date of satisfying the [final] judgment," expressly adding the bracketed words. In so doing, the majority holds that "whenever the judgment debtor appeals the judgment, the interest rate switches from nine percent to the [postjudgment] market-based rate," maj. op. ¶ 4, and thus summarily renders subsections (2)(a) and (2)(b) of the statute entirely superfluous. Moreover, in applying its rewritten statute to the facts of this case, the majority ignores the fundamental legal principle that a judgment that is reversed is void and of no effect.

¶86 The majority's holding in this case is especially troubling given this court's regrettable history of tinkering with this very statute. In *Rodriguez v. Schutt*, 914 P.2d 921, 929–30 (Colo. 1996), we excised language from the same section at issue to preserve the statute's constitutionality. However, we later lamented that our attempt to do so only "amplified the [statute's] ambiguity" and "highlight[ed] the problem that occurs when courts [redraft] statutory language." *Sperry v. Field*, 205 P.3d 365, 369 (Colo. 2009); *see also id.* at 370 (Eid, J., concurring) (noting that our attempt in *Rodriguez* to "redraft[]" the statute was "less than successful"). Apparently, we have not learned from our past mistakes. By rewriting the statute to address the specific scenario presented here (i.e., where a personal-injury judgment debtor obtains reversal of the original judgment but ultimately loses on retrial and incurs another judgment), the majority usurps the role of the General Assembly. Should the legislature wish to amend section 13-21-101, it is free to do so. I recognize that there are strong policy arguments on both sides; indeed, the majority discusses policy implications at great length. But such policy decisions, and any amendments to the statute, properly rest with the legislature—not this court. Absent further direction from the General Assembly, I would simply apply the statute as written. Accordingly, I respectfully dissent.

## I. Facts and Procedural History

¶87    In 2009, Walker sustained injuries in a car accident and brought a product liability action against Ford.  He proceeded to a jury trial in 2013 and was awarded $2,915,971.20 in damages.  Ford appealed, arguing that there was a jury instruction error, and a division of the court of appeals reversed and remanded for a new trial. We granted Walker's petition for certiorari review but affirmed the court of appeals.  In short, the original verdict and judgment was set aside, thereby returning the parties to the positions they were in prior to the first trial.

¶88    In 2019, the case was retried.  Walker again prevailed, and the second jury awarded him $2,929,881.20 in damages.  Pursuant to section 13-21-101(1), Walker requested prejudgment interest at the statutory rate of nine percent from the date of injury in 2009 until the date of suit in 2011, and prejudgment interest at the statutory rate of nine percent, compounded annually, from the date of suit to the satisfaction of judgment in 2019.  The district court granted Walker's requests. Ford did not appeal the 2019 judgment but did appeal the district court's ruling regarding the interest award, contending that the lower, market-based postjudgment interest rate should apply from the date of Ford's appeal of the 2013 judgment through the satisfaction of the 2019 judgment.  A division of the court of appeals affirmed, and we granted Ford's petition for writ of certiorari to review the division's decision.

4

## II. Analysis

## A. Legal Principles

¶89 Questions of statutory interpretation are reviewed de novo. *Goodwin*, 185 P.3d at 779. We begin our interpretation by looking to the plain language of the statute. If the plain language is unambiguous, we look no further. *Nieto v. Clark's Market, Inc.*, 2021 CO 48, ¶ 12, 488 P.3d 1140, 1143. "[W]e do not add words to or subtract words from a statute." *Id.* (alteration in original) (quoting *People ex rel. Rein v. Meagher*, 2020 CO 56, ¶ 22, 465 P.3d 554, 560). "[A]nd we avoid constructions that would render any words or phrases superfluous . . . ." *Elder v. Williams*, 2020 CO 88, ¶ 18, 477 P.3d 694, 698.

## B. Section 13-21-101

¶90 The issue in this case is how to apply section 13-21-101 to assess interest on personal injury damages when a judgment debtor successfully obtains reversal of the original judgment on appeal but loses on retrial and incurs a new judgment. The applicable statutory provisions read as follows:

> Section 13-21-101(1): "[W]hen . . . interest is claimed, it is the duty of the court in entering judgment for the plaintiff in the action to add to the amount of damages assessed by the verdict . . . interest on the amount calculated at the rate of nine percent per annum . . . [I]f a judgment for money in an action brought to recover damages for personal injuries is appealed by the judgment debtor, postjudgment interest must be calculated . . . *from the date of judgment through the date of satisfying the judgment* and must include compounding of interest annually." (Emphasis added.)

5

Section 13-21-101(2)(a): "If a judgment for money in an action brought to recover damages for personal injuries is appealed by a judgment debtor and the judgment is affirmed, postjudgment interest . . . is payable from the date of judgment through the date of satisfying the judgment."

Section 13-21-101(2)(b): "If a judgment for money in an action to recover damages for personal injuries is appealed by a judgment debtor and the judgment is modified or reversed with a direction that a judgment for money be entered in the trial court, postjudgment interest . . . is payable from the date of judgment through the date of satisfying the judgment. This postjudgment interest is payable on the amount of the final judgment."

§ 13-21-101(1)–(2).

¶91    The majority determines that with respect to postjudgment interest, these provisions are susceptible to two reasonable interpretations. First, they can be read to require postjudgment interest only in the outcome-specific situations identified in subsections (2)(a) and (2)(b)—that is, when the judgment is "affirmed," "modified," or "reversed with a direction that a judgment for money be entered in the trial court." *Id.* at (2)(a)-(b); *see* maj. op. ¶ 33. Second, they can be read to require that postjudgment interest apply *anytime* "a judgment for money in an action brought to recover damages for personal injuries is appealed." § 13-21-101(1); *see* maj. op. ¶ 34. Under this reading, postjudgment interest applies under subsection (1) "from the date of the *appealed* judgment [in the instant case, the 2013 judgment] through the date of satisfying the *final* judgment [the 2019

6

judgment]." Maj. op. ¶ 51 (emphases added). Ultimately, the majority finds the second reading more persuasive.

¶92 The problem with the majority's analysis is that it finds ambiguity only by adding words to the statute. The General Assembly did not include the term "final judgment" in section 13-21-101(1). It referred to only a single judgment, "the judgment." And it required interest to be calculated on "the sum" of *that judgment*. § 13-21-101(1). In short, "[w]e do not add words to . . . a statute" to create ambiguity where there is none. *Nieto*, ¶ 12, 488 P.3d at 1143 (quoting *Meagher*, ¶ 22, 465 P.3d at 560).

¶93 When the statute is read as written, without adding words to section 13-21-101(1), the statute is unambiguous. The meaning of "judgment" as used in section 13-21-101(1) can be straightforwardly gleaned from basic principles of appellate procedure and the remainder of the statute.

¶94 It is well established that when a judgment is reversed or vacated, it ceases to exist for all purposes. *See Schleier v. Bonella*, 237 P. 1113, 1113 (Colo. 1925) (A judgment of reversal "leaves the parties in the same position as they were before the judgment of the lower court was rendered."); *Butler v. Eaton,* 141 U.S. 240, 244 (1891) (A vacated judgment is "without any validity, force, or effect, and ought never to have existed."); *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 250 F.3d

7

482, 491 (6th Cir. 2001) ("When a judgment is vacated it is legally void and unenforceable.").

¶95   As the court of appeals has explained, "[u]nder Colorado law, if a judgment is reversed, the parties are put in the same position they were in before the judgment was rendered. Thus, when an appellate court reverses a judgment, 'upon remand, that judgment no longer exists.'" *Sharon v. SCC Pueblo Belmont Operating Co., LLC*, 2019 COA 178, ¶ 17, 467 P.3d 1245, 1251 (citations omitted) (quoting *Bainbridge, Inc. v. Douglas Cnty. Bd. of Comm'rs*, 55 P.3d 271, 274 (Colo. App. 2002)). And crucially, "the reversal of the judgment also nullifies 'an award that is dependent on that judgment for its validity.'" *Id.* (quoting *Bainbridge*, 55 P.3d at 274).

¶96   Applying this principle, "the judgment," referred to in section 13-21-101(1) cannot refer to the 2013 judgment. That judgment ceased to exist for all purposes when it was reversed by the court of appeals, *Walker v. Ford Motor Co.*, 2015 COA 124, ¶ 3, 410 P.3d 609, 611, and we affirmed that reversal, *Walker v. Ford Motor Co.*, 2017 CO 102, ¶ 2, 406 P.3d 845, 847. Any obligation to pay the 2013 judgment, let alone the postjudgment interest that had been accruing on "the sum" of the 2013 judgment that was appealed, was also nullified. The parties were restored to the positions they occupied prior to trial. Instead, "the judgment" under section 13-21-101(1) must refer here to the 2019 judgment, the only judgment that still

8

exists and to which interest can attach. Thus, statutory nine percent prejudgment interest was properly applied from the accrual of the claim in 2009 to the entry of judgment after the retrial in 2019.

¶97 The majority's reading of section 13-21-101(1) ignores this principle. The logic of the majority's opinion necessarily assumes that the initial judgment has legal effect and, that therefore, interest can be calculated with respect to it. But the basic principle that a vacated judgment has no legal effect for any purpose (a principle against which the General Assembly drafted the statute) plainly counsels against the majority's interpretation. And absent a clear indication of legislative intent to define "judgment" differently than it is normally understood, I see no reason to ignore well-established law.

¶98 The majority's reading also does harm to the plain language of the statute. For the majority's reading to work, the word "judgment" must have two different meanings within the same phrase of the same sentence. As the majority posits, the "date of judgment" refers to the "appealed judgment" (here, the nonexistent 2013 judgment), but "date of satisfying the judgment" refers to the "final judgment" (here, the only existing, 2019 judgment). But although the last sentence of section 13-21-101(1) concerns a judgment that is appealed, it does not use the term "final judgment." And we know from neighboring section 13-21-101(2)(b) that when the legislature intended to use this term, it did so expressly. *See*

9

§ 13-21-101(2)(b) ("This postjudgment interest is payable on the amount of the *final* judgment.") (emphasis added).  The majority's reading of the final sentence in section 13-21-101(1) also makes no practical sense as applied here, because the provision expressly requires the postjudgment interest to be calculated on "the sum" of the judgment being appealed.  § 13-21-101(1) ("[I]f a judgment . . . is appealed by the judgment debtor, postjudgment interest must be calculated on the sum at the [market-based rate in subsections (3) and (4)] . . . .").  Even the majority recognizes that any postjudgment interest cannot be calculated based on "the sum" of the *2013* judgment that was appealed.

¶99    Importantly, as the majority seems to admit, maj. op. ¶ 31, its reading renders subsections 13-21-101(2)(a) and (2)(b) entirely superfluous.  These subsections lay out the circumstances under which postjudgment interest applies when a party appeals.  Under subsection (2)(a), if the "judgment is *affirmed*, postjudgment interest . . . is payable from the date of judgment through the date of satisfying the judgment." (Emphasis added).  And under (2)(b) if the "judgment is *modified or reversed with a direction that a judgment for money be entered in the trial court*, postjudgment interest . . . is payable from the date of judgment through the date of satisfying the judgment." (Emphasis added).  It is unclear why the General Assembly would include two subsections explicitly providing the circumstances under which postjudgment interest applies if a party appeals if—as the majority

10

concludes—it simply intended for postjudgment interest to apply *anytime* a party appeals. Had it chosen to, the General Assembly could easily have written that postjudgment interest applies after any appeal. Alternatively, it could have included a subsection (2)(c) providing that where the judgment debtor succeeds on appeal and the initial judgment is vacated but later incurs a second judgment, postjudgment interest runs from the date of the initial judgment appealed. But the legislature has not chosen to do either of these things, and it is not this court's role to rewrite the statute for the General Assembly.

¶100 Rather than read the last sentence of section 13-21-101(1) to render all of subsection (2) superfluous, I would instead apply the statute as written. Section 13-21-101(1) explains generally how postjudgment interest must be calculated: "at the [market] rate set forth in subsections (3) and (4)" including compounded annual interest.[1] Subsections (2)(a) and (2)(b) provide the detail.

---

[1] Under the 1982 version of the statute, subsection (1) specified the trigger date for of accrual of interest ("the date the action accrued") but did not identify an end date. Subsections (2)(a) and (2)(b) added the details to complete the calculation ("until satisfaction of the judgment"). § 13-21-101, C.R.S. (1982). The 2018 amendments to section 13-21-101 to codify this court's holdings in *Rodriguez* and *Sperry* were grafted onto the 1982 statute, but in doing so, the legislature added the interest calculation endpoint to subsection (1) (from the date "of judgment to the date of satisfying the judgment"), replicating what was already present in subsections (2)(a) and (2)(b). § 13-21-101, C.R.S. (2018).

11

These provisions explain when postjudgment interest should be calculated if a party appeals and the judgment is affirmed, modified, or reversed with instructions that a new judgment be entered.

¶101 Thus, when a judgment is appealed and *affirmed*, we look to subsection (2)(a). This subsection provides that when a judgment is affirmed, postjudgment interest applies from the date of the judgment through the date satisfying that same judgment. Because there is only one judgment in this scenario, the one affirmed on appeal, this provision plainly requires postjudgment interest to be applied throughout the appellate process and until the judgment is satisfied.

¶102 When a judgment is effectively upheld in part—that is, the judgment is *modified* on appeal, or is *reversed with instructions to enter a new judgment*—we look to subsection (2)(b). This subsection explains that we apply postjudgment interest "from the date of judgment through the date of satisfying the judgment." From the remainder of subsection (2)(b), we can infer that postjudgment interest is calculated from the date of the modified or new judgment because subsection (2)(b)'s final sentence explicitly tethers the amount of damages to the "final judgment." § 13-21-101(2)(b) ("*This postjudgment interest* is payable on the amount of the final judgment.") (emphasis added). This language indicates that "judgment," as used in subsection (2)(b), refers to the "final judgment" (i.e., the

modified or new judgment), not the initial judgment. Interpreting the provision this way gives the term "judgment" a single, consistent meaning throughout the provision, and it also comports with the principle of appellate jurisprudence that reversed judgments cease to exist for all purposes.[2]

¶103 The General Assembly did not address what happens when a judgment is simply *reversed* on appeal. Of course, there was no need to, because reversal nullifies any obligation to pay the judgment, including any associated interest. There is nothing to calculate. But the legislature likewise did not draft a subsection (2)(c) explaining how to calculate interest where, as here, a judgment is reversed on appeal but the judgment debtor incurs a new judgment following retrial. Subsection (2) simply does not provide for this particular scenario. But the answer lies in section 13-21-101(1). As previously explained, that section provides that a successful tort plaintiff is entitled to statutory nine percent prejudgment

---

[2] I note that current market conditions create very different incentives than existed in 1982 when the legislature established this structure. At that time, the market rate for postjudgment interest under the statute was eleven percent, higher than the nine percent prejudgment interest rate. *See* Elizabeth A. Montgomery, *Rates of Interest on State and Federal Court Judgments: An Update*, 12 Colo. Law. 437, 451 (1983). While it may be tempting to rewrite the statute to account for different incentives that exist under the current lower market interest rate, the job of updating statutes to account for such policy considerations lies with the General Assembly, not this court.

interest on the damages assessed by the jury, compounded annually, "calculated from the date the suit was filed to the date of satisfying the judgment." § 13-21-101(1), C.R.S. (2021). The only existing judgment here is the 2019 judgment, which Ford has not appealed. There is no postjudgment interest to calculate.

¶104 Interpreting the statute this way comports with the principles of statutory interpretation that guide this court. It provides each provision of the statute with an independent purpose, does not render any of provision of the statute superfluous, and does not require us to add words to the statute. It also comports with the fundamental principle of appellate procedure that judgments that are vacated no longer exist. Because section 13-21-101 can be straightforwardly applied according to its plain language, I see no reason to create ambiguity where there is none.

## C. Legislative Intent

¶105 Instead of applying the plain language of the statute, the majority attempts to redraft the statute to better comport with what it presumes to be the General Assembly's intent. However, it is not obvious that the legislature would make the same revisions put forward by the majority.

¶106 To the contrary, the majority's holding may well cut against the statute's dual legislative purpose. As the majority notes, the statute was designed "to neutralize the economic benefits and detriments of appeal under the statutorily-set

14

rate of interest" and to ensure that the judgment creditor "receives the time value of his or her money judgment." Maj. op. ¶ 65 (quoting *Rodriguez*, 914 P.2d at 928–29). Regarding the first rationale, the majority's holding may incentivize judgment debtors to draw out second trials and then file frivolous appeals to take advantage of the (currently lower) postjudgment market interest rate. Regarding the second rationale, the majority's holding may cut against the legislative intent to ensure that parties are made whole. The General Assembly may well have intended that injured parties receive the statutory nine percent interest rate on the judgment under these circumstances to ensure that they are adequately compensated for the time value of their judgment. *Morris*, 185 P.3d at 780. Walker was injured in 2009 and has waited over a decade to be finally fully compensated for his injuries.

¶107 The majority contends that applying the prejudgment interest rate during the pendency of a successful appeal is unfair to Ford and so absurd that the legislature could not possibly have intended it. But the result here is not necessarily unfair. Ford successfully appealed and got exactly what it asked for: reversal of the 2013 judgment, which returned the parties to the status quo prior to trial. Once returned to that position, the parties could have settled the case. Instead, Ford proceeded to trial and opted to roll the dice. Unfortunately for Ford,

the trial did not come out as hoped. But that outcome does not necessarily render the proceedings unfair or render the statute absurd.

### III. Conclusion

¶108 How to fashion an interest scheme that neutralizes the financial incentives (or disincentives) to appeal while ensuring that a successful tort plaintiff is fully compensated is a complex policy issue. Perhaps, as Justice Scott suggested in his dissent in *Rodriguez,* the best solution is to do away with the distinction between prejudgment and postjudgment interest altogether and simply apply "a market-determined rate of interest on both appealed and nonappealed judgments." 914 P.2d at 932 (Scott, J., dissenting). However, I would leave the role of balancing these competing legislative objectives where it properly belongs, with the General Assembly, and simply apply the statute as written. I respectfully dissent.